**Electronically Filed
Supreme Court
SCWC-15-0000643
22-NOV-2019
09:11 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

MARLIN L. LAVOIE,
Petitioner/Defendant-Appellant.

SCWC-15-0000643

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000643; CR. NO. 13-1-0236(3))

NOVEMBER 22, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

The circuit court in its pretrial order in this case excluded evidence of "other bad acts" committed by the defendant. At trial, however, the court ruled that the defendant, by questioning a State's witness about a single instance of separation between the defendant and the decedent, opened the door to the defendant's prior acts of abuse. Over objection, the court admitted into evidence five instances of

prior abuse that were not shown to be followed by a period of separation between the defendant and the decedent. The prior misconduct in this case was admitted to rebut the affirmative defenses of lack of penal responsibility and extreme mental and emotional distress. In an unsuccessful appeal to the Intermediate Court of Appeals, the defendant argued that the circuit court erred in admitting the prior incidents of abuse, failed to properly limit consideration of the prior misconduct evidence, and omitted a requisite jury instruction on merger.

On certiorari, we review the "opening the door" doctrine and determine whether the circuit court correctly ruled that the door was opened in this case. We also address, in the context of a limiting instruction, the crucial difference between a defendant's state of mind to commit an offense and a defendant's mental condition as it applies to the affirmative defenses of lack of penal responsibility and extreme mental and emotional distress. Finally, we consider whether the crimes of felon in possession and place to keep are continuous crimes, necessitating a merger instruction in this case.

Based upon our review, we conclude that the five prior acts of abuse were erroneously admitted. We also hold that the circuit court erred by not submitting a merger instruction to the jury because the crimes of felon in possession and place to keep are continuous crimes and the determination of merger must

be made by the trier of fact.  Accordingly, we vacate the convictions in this case and remand for further proceedings consistent with this opinion.

## I.    BACKGROUND AND CIRCUIT COURT PROCEEDINGS

On March 20, 2013, Malia Kahalewai was fatally shot at the Kawela Barns Apartments on the island of Moloka'i.  Kahalewai was the longtime girlfriend of Marlin L. Lavoie, with whom she lived in Honouliwai Valley, and the couple had four children together.

Lavoie was charged by complaint in the District Court of the Second Circuit with the following offenses: murder in the second degree in violation of Hawai'i Revised Statutes (HRS) § 707-701.5;[1] carrying or use of a firearm in the commission of a separate felony in violation of HRS § 134-21(a);[2] ownership or possession prohibited of any firearm in violation of HRS § 134-7(b);[3] and place to keep loaded firearms other than pistols and

_____

[1]    HRS § 707-701.5 (1993) provides in pertinent part: "Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

[2]    HRS § 134-21(a) (2011) provides in pertinent part:

It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not.

[3]    HRS § 134-7(b) (2011) provides in full:

(continued . . .)

revolvers in violation of HRS § 134-23(a).[4]  An amended complaint was subsequently filed in the Circuit Court of the Second Circuit (circuit court).[5]

### A. Motion to Determine Fitness to Proceed and Penal Responsibility

Lavoie moved for an examination of his fitness to proceed and penal responsibility pursuant to HRS § 704-404 (1993 & Supp. 2008).  A three-doctor panel examined Lavoie, and the examiners filed their reports with the court on October 17, 2013.  At a hearing, Lavoie stipulated that he was fit to proceed.[6]

---

(. . . continued)

> No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.

[4]  HRS § 134-23(a) (2011) provides in pertinent part:

> Except as provided in section 134-5, all firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn . . . .

[5]  The amended complaint removed a charge of terroristic threatening in the first degree in violation of HRS § 707-716(e) (Supp. 2011) that was included in the initial complaint and added a misdemeanor count of abuse of family or household member in violation of HRS § 709-906 (1993 & Supp. 2012) and a misdemeanor count of assault in the third degree in violation of HRS § 709-712(1)(a) (1993).  Both of the added offenses were later dismissed without prejudice.

[6]  The motion and trial proceedings were presided over by the Honorable Joseph Cardoza.

On May 15, 2015, a hearing was held on motions in limine, at which time the court granted the defense's motion to preclude the use of any prior bad acts at trial. The motion in limine was granted without objection by the State although the prosecutor stated that, "should the door be opened" through cross-examination by the defense or in the defense's case-in-chief, it would ask for the court's reconsideration. The court's written order excluded testimonial and documentary evidence relating to Lavoie's prior criminal history and "bad acts" committed by Lavoie that included allegations of any crimes of violence.

**B. Trial**

The State called Nicole Aea, a friend of Kahalewai, who testified that she was with Kahalewai in the hours leading up to the shooting at their mutual friend Barbara Haliniak's apartment. Aea testified that Kahalewai had been alternating between staying with Haliniak and Haliniak's neighbor, Victoria Toledo. Aea stated that, when Lavoie arrived at Haliniak's apartment on the evening of the shooting, she was with Kahalewai and her two friends Maile Manintin and Leilani Mollena in Haliniak's bedroom. Manintin later testified that, when they were told that Lavoie was in the house, they shut off the lights in the bedroom and closed the door. She said that Lavoie came

into the room by pushing the door open while one of her friends was still holding on to the doorknob.

Lavoie asked Kahalewai to talk to him alone and to come home, Aea said, but Kahalewai repeatedly told him no. Aea stated that Lavoie told Kahalewai that their children missed her and continued to ask her to talk to him, to which Kahalewai kept responding, "no, go away." After five to ten minutes of Lavoie begging Kahalewai to come with him, his eyes started to tear-up and he became "clearly upset and sad," Aea testified.

Eventually, Aea stated, she and Kahalewai left the bedroom and went out to the porch. Aea indicated that they were joined by Manintin and Mollena. Aea testified that while the four were socializing, Lavoie was at the bottom of the porch still teary-eyed and continuing to ask Kahalewai to come home. Lavoie recounted in an interview with Detective (Det.) Jeffrey Mahoney, recorded the morning after the shooting, that when they were on the porch Kahalewai would reply only by calling him names and saying things such as "I no love you, I no like be with you," "go be with a guy," and "fuck you faggot, fuck, I no love you faggot, you ugly." Manintin testified that she heard Lavoie say to Kahalewai "why no like me, you no love me, we have a family . . . we got family together, just come home." Aea said that the conversation ended when Kahalewai told Lavoie "you should find a guy because this bitch not going to take care of

6

you anymore." Lavoie told Det. Mahoney that this made him "freak[] out" and "[he] just snapped."

Lavoie stated in the interview that he asked Kahalewai, "[T]hat's what you think I am?" and then went to his car and retrieved his rifle. Aea testified that when Lavoie came back to the porch, he said, "[Y]ou gonna leave me," and shot her once in the chest from close range. Kahalewai was transported to the Molokaʻi General Hospital where she was pronounced dead shortly thereafter.[7]

During the police interview, Lavoie said that after the shooting, he immediately "freaked out" and ran away. He stated that he returned to his vehicle with his rifle, drove to his home, and hid the rifle in bushes on his neighbor's property. Lavoie told Det. Mahoney that his father, who was at home when he returned, advised him to turn himself into the police.[8]

During his interrogation, Lavoie admitted to Det. Mahoney that he shot Kahalewai. Lavoie told Det. Mahoney that he had bipolar disorder, and on the night of the shooting he snapped because Kahalewai's comments made him "depressed, but not pissed off." He said that he did not plan to go to

---

[7] An autopsy determined that the cause of death was a single gunshot wound to the chest.

[8] Det. Greg Katayama testified that Lavoie turned himself in the morning after the shooting.

Haliniak's house to kill her, but "[d]arkness took over [him]" and he "just lost [his] mind."[9]

During defense counsel's cross-examination of Aea, counsel requested a bench conference to notify the court that his questioning of Aea might elicit information on what "could be conceivably construed as a prior bad act" addressed in Lavoie's motion in limine. Defense counsel stated that he intended to question Aea about "[Kahalewai] leaving [Lavoie] in the aftermath of arguments for some period of time." The prosecutor did not object but stated that such questions would open the door to why she would leave and what the arguments were about. Defense counsel responded by saying, "That may be the case."

> Defense counsel asked Aea the following:
>
> Q. We were talking about the arguments that [Lavoie] and [Kahalewai] would get into over the course of their relationship. After some of those arguments, you're aware that [Kahalewai] would leave [Lavoie], leave the family, and go stay at friends' houses. Correct?
>
> A. Yeah, for a couple of days.
>
> Q. Okay. Sometimes even for like a week or two. Right?
>
> A. Barely. Maybe once in a great, great while, depending on how big the argument was before.
>
> Q. One time she left for Oahu. Correct?

---

[9] Det. Mahoney testified that he did not detect Lavoie to be under the influence of alcohol or drugs during the interview. Det. Mahoney spent five to six hours with Lavoie from the start of the interview through transport back to Wailuku cellblock, and in that time, Lavoie did not say that he was hearing voices or seeing anything on the night of the shooting.

A. Yes.

Q. And she stayed away for like maybe a week and a half, two weeks with your friend [Jamie Maikui]?

. . .

A. Yeah.

Q. Okay. On the night in question, [Kahalewai] had been apart from [Lavoie] for approximately four days. Correct?

A. Yes.

Q. And you knew that for at least the last two days prior to the shooting, [Lavoie] had been looking around for [Kahalewai]. Right?

A. Yes.

Q. Okay. But [Kahalewai] wanted to stay out that night because you guys had planned to do a girls night on the 20th. Right?

A. Yeah.

Q. Okay. And there was a bachelorette party--your bachelorette party, right, that she had been attending over those four days?

A. Yeah.

Q. And you knew that [Lavoie] was upset that [Kahalewai] had been away for those four days. Right?

A. Yeah.

Following defense counsel's cross-examination of Aea, the prosecutor requested a bench conference and asserted that, because the defense asked about past arguments, "the door has been open for us to ask the nature of those arguments." The prosecutor stated that the testimony would show that "at least some of these arguments involved a prior abuse, and [Kahalewai] leaving to get away from the defendant." Defense counsel objected, arguing that the door had not been opened and that Aea

9

had no personal knowledge of the reasons behind the various separations between Kahalewai and Lavoie. The prosecutor sought to introduce evidence of a prior incident from February 2007 in which Lavoie threatened Kahalewai with a gardening pick in the presence of Aea. Defense counsel objected to the introduction of this incident on the grounds that it was more prejudicial than probative given how temporally remote it was to the shooting.

The trial court allowed the evidence, finding that the door "perhaps" had been opened not just for Aea but other witnesses as well. Specifically, the trial court responded to defense counsel as follows:

> Because your line of questioning has suggested that [Kahalewai]'s departure caused a reaction which caused him to lose control of his thoughts and his actions, or ultimately it's going to be for the trier of fact to determine whether or not, from the defendant's standpoint, if he's been inflicting abuse on [Kahalewai], whether it would be reasonable, from his standpoint, to then become upset or enraged by her departure, such that it would mean that the--that defense would be a viable one. And then there's the whole 704 issues.

The prosecutor then asked Aea about arguments between Lavoie and Kahalewai that she had witnessed. Aea testified that Lavoie and Kahalewai had "normal fights, there was no shock they were grumbling; they'd fight, she dig out, she'd come back." These arguments were mostly about Kahalewai wanting more space to "hang out with friends, [and] do her own thing," Aea said. Aea agreed that the type of argument the couple was having on

the night of the shooting appeared to be "nothing new."  When questioned about the February 2007 incident, Aea testified, over defense objection, that she witnessed Lavoie "grumbling" with Kahalewai before he picked up a gardening pick and said "nobody going to find you, you guys."  There was no testimony that Kahalewai left Lavoie after this incident.

The State sought to admit other instances of abuse by Lavoie through Haliniak's sister, Alexis Haliniak (A. Haliniak).  Before she took the stand, defense counsel requested a bench conference where he requested a proffer from the State as to what A. Haliniak would be testifying about and how her testimony would relate to the opening of the door.  The prosecutor responded that it sought to introduce testimony about two prior incidents of Lavoie's abuse: one where A. Haliniak saw Lavoie choke Kahalewai; and another where she witnessed Lavoie yell at and allegedly threaten Kahalewai during a poker game.  Lavoie objected on the basis that these incidents were not relevant because there was no indication that they had any connection to "[Kahalewai] separating herself from [Lavoie], and that [Lavoie] react[ed] violently to that separation."

The court sustained Lavoie's objection as to the poker game incident because of the vagueness of Lavoie's behavior proffered by the State.  As to A. Haliniak's testimony regarding the incident of alleged choking, the court ruled that the door

11

had been opened and the incident held "significant probative value concerning the reasonableness of the explanation" for Lavoie's emotional distress.  The trial court further ruled that

> the reasonableness of the explanation, on one hand, trying to cope with the loss of a partner is one thing.  Causing the loss of a partner by acts of physical abuse, and then saying you're overwhelmed by that may be viewed entirely different by the trier of fact.  And that may not be viewed as reasonable.  So I think the door has been opened to that.

A. Haliniak then testified that two to four months prior to October 2012, she witnessed Lavoie choking Kahalewai until "the color on [Kahalewai]'s face was turning a little pinkish red."  Lavoie only stopped after her boyfriend threatened to call the police, A. Haliniak testified.  Again, there was no testimony that Kahalewai left Lavoie after the incident.

The State called Jamie Maikui, a close friend of Kahalewai, to testify about a domestic violence incident that occurred between Lavoie and Kahalewai on March 16, 2013--the event that led to the separation before the shooting.  Maikui testified that while she and Kahalewai were driving, they saw that Lavoie was following them in his car.  They pulled into a church parking lot and lit a cigarette, Maikui said, at which point Lavoie approached the car; Kahalewai rolled the window down to pass him a cigarette.  Maikui testified that Lavoie then opened the door with his spare key.  Maikui stated that she tried to drive away, but that Lavoie held on to the car until

12

she stopped. She testified that after the car stopped, Lavoie punched her three times and elbowed Kahalewai in the face in the process of taking the keys from the ignition.

The State also attempted to question Maikui regarding incidents when she had witnessed Lavoie "do anything physical or threatening to [Kahalewai] before." After proffering that Maikui would testify about the gardening pick incident that Aea had testified about and an incident four to five years before the shooting where, as Maikui was driving by, she saw Lavoie punch Kahalewai, the court excluded the testimony over concerns about the time frame. The prosecutor told the court that there were further witnesses that he could bring in rebuttal to show a continuing pattern of abuse followed by Kahalewai leaving Lavoie but always returning.

The State also called as a witness Victoria Toledo.[10] Toledo testified that, on the day of the shooting, Lavoie came

---

[10] Prior to Toledo taking the stand, defense counsel stated in a bench conference that he anticipated Toledo would testify regarding an encounter with Lavoie that Toledo would claim occurred on the day of the shooting. Counsel explained, however, that the prosecutor had disclosed that Toledo had told the prosecutor, in an interview at which there were no other witnesses present, that the encounter with Lavoie had occurred several days before the shooting.

Defense counsel requested that the court preclude the State from calling Toledo as a witness if the prosecutor was going to remain the State's lead attorney, as defense counsel would be forced to call the prosecutor as a witness in the defense case. In response, the prosecutor suggested that at defense counsel's request, he would make a representation on the record before the jury as an officer of the court. Defense counsel agreed to the prosecutor's proposed procedure. Both the State and defense questioned Toledo regarding the inconsistency of her accounts, but she maintained that she had only ever given one version of events. Thus, in accordance with the

(continued . . .)

to her apartment and asked her boyfriend if Kahalewai was "fooling around on him." She told Lavoie that Kahalewai was not fooling around on him, Toledo stated, but Lavoie responded "[i]f I can't have her no one will." Toledo acknowledged on cross-examination that she disliked Lavoie because he had killed her friend, and that she did not relate her story to the police because, despite saying they would follow up, they never contacted her.[11]

Dr. Kohn, a neurologist, psychiatrist, and psychotherapist was called to testify by the defense.[12] Dr. Kohn diagnosed Lavoie with bipolar disorder and testified that "as a component of that mental disorder, [Lavoie] has been psychotic on a recurring or continuous basis." In his medical opinion, Dr. Kohn stated, on March 20, 2013, Lavoie suffered a "dissociative episode in which, faced with this experience that

_____

(. . . continued)

agreed-upon procedure, at the completion of Toledo's testimony, the prosecutor stated in open court the following:

> [P]ursuant to our bench conference, as an officer of the court, Your Honor, I would like to put on record that on July 18, 2014, in a telephone conversation with [] Victoria Toledo, I recall her saying that Marlin Lavoie told her, "If I can't have Malia, nobody else will," and that the conversation took place a few days before the shooting.

[11]    At the close of the State's case-in-chief, the parties stipulated that prior to March 20, 2013, Lavoie was previously convicted of a felony.

[12]    Dr. Kohn testified that he was board certified in neurology by the American Board of Psychiatry and Neurology and taught psychiatry at the University of Chicago Medical School.

was unmanageable for him, he could not think clearly."[13]  Dr. Kohn found that there were several "factors that contributed to [Lavoie]'s inability to understand what was happening to him and to manage his feelings and actions."  These factors included brain injury from repeated trauma, his family history of mental illness, his history of being sexually abused as a child, and his history of psychiatric treatment.[14]  Dr. Kohn testified that these factors, compounded with Lavoie's bipolar disorder, "prevented him[] from controlling himself from understanding what was happening and behaving in a way that would have been expected of him."  As a result, Dr. Kohn opined, Lavoie lacked substantial capacity to conform his conduct to the requirements of the law.  Dr. Kohn testified that Lavoie "had awareness that what he was doing was wrong and bad but wasn't able to stop himself."

Additionally, Dr. Kohn opined that Lavoie was under the influence of an extreme mental or emotional disturbance

---

[13]     Dr. Kohn also testified that Lavoie told him that he was hearing voices at the time.

[14]     Dr. Kohn testified that Lavoie experienced three instances of sexual abuse as a child: once by his babysitter, and the other two incidents involving "older teenagers that [Lavoie] was riding bikes with in the neighborhood."  Dr. Kohn stated that Lavoie told him that his mother said to "get over it," and his father "was similarly unsupportive."  He further testified that Lavoie's mother had undergone a psychiatric hospitalization and was diagnosed as being schizophrenic.  As an adult, Dr. Kohn testified, Lavoie had been institutionalized in the Alaska Psychiatric Institute for manic episodes with psychosis.

(EMED) at the time of the shooting. Dr. Kohn testified that Lavoie's mind was "dominated by intense emotion in a way that altered his usual process of thought and interfered substantially with his ability to reason." This was brought about by two main factors, Dr Kohn stated: first, Lavoie "was distraught over [Kahalewai's] absence" and "was in the middle of a reaction to separation and loss" that caused him to be depressed and suicidal; and second, Lavoie was "unable to manage his feelings in reaction to [Kahalewai's] provocations," including when she mocked him with sexual taunts in front of others, showing "her contempt rather than compassion for the history that he'd revealed to her." While Dr. Kohn testified that Lavoie and Kahalewai had a "mutually abusive" relationship, he said that those prior instances of violence were consistent with his opinion.

The defense then called Dr. Marvin Acklin, who was qualified as an expert in forensic psychology.[15] Dr. Acklin diagnosed Lavoie with "bipolar disorder type 1 versus disruptive mood disorder," and borderline personality disorder and "perhaps, anti-social personality traits." Several factors were

_____

[15]     Dr. Acklin testified that he was board certified in psychology, clinical psychology, and forensic psychology. He stated that he was a professor of psychology at Loyola University of Chicago before becoming a faculty member at the John A. Burns School of Medicine at the University of Hawai'i in the department of psychiatry. In addition to his academic experience, he also testified that he maintained an independent practice in psychology.

important in his diagnosis, Dr. Acklin testified: Lavoie's "extensive mental health history," his family's history of mental illness, the tests that Dr. Acklin had conducted on Lavoie, the accounts of Lavoie's relationship with Kahalewai, the sexual abuse that Lavoie experienced as a child, and Lavoie's history of head trauma.

Dr. Acklin further testified that Lavoie had three psychiatric "treatment episodes": one in Alaska when Lavoie was 18, one in 2008 or 2009, and one after the shooting. Dr. Acklin stated that Lavoie was admitted to the Alaska Psychiatric Institute and was believed to be suffering from "some form of psychosis with paranoid delusions." Lavoie was prescribed Haldol, a "commonly used antipsychotic medication," both after the Alaska hospitalization and after the shooting, Dr. Acklin explained. Dr. Acklin concluded that at the time of the shooting Lavoie was aware that what he was doing was wrong, but he was not able to stop himself; that is, he "lacked substantial capacity to conform his conduct to the requirements of the law."[16]

Dr. Acklin also concluded that at the time of the shooting, Lavoie was under the influence of EMED as he was in a

---

[16]   Dr. Acklin indicated that Lavoie would not have "lacked substantial capacity to control his actions" if he had a plan to kill Kahalewai.

state of desperation because he believed that Kahalewai was abandoning him. Dr. Acklin testified that Lavoie's feeling of abandonment was a "primary factor" in his emotional disturbance, but public shame also played a role. Kahalewai's leaving and the "traumatizing break up" constituted a reasonable explanation for Lavoie's EMED, Dr. Acklin explained.

In addition, Dr. Acklin testified that Lavoie's relationship with Kahalewai involved "emotional turmoil" and was "unstable," "stormy," and abusive. He noted two particular instances of physical abuse: first, the incident on March 16, 2013, when Lavoie elbowed Kahalewai in the face; and second, a 2008 conviction for abusing Kahalewai. Dr. Acklin also testified on cross-examination that Lavoie wrote a note after his 2008 conviction that "could be construed as a threat to kill himself."[17] Dr. Acklin stated that the threat did not influence his ultimate opinion in the case.

---

[17] Before testifying about the note, the court instructed the jury that the "evidence is being offered in relation to the--or in connection with the expert's opinion, and it may be considered only on the issue of the defendant's intent and for no other purpose." On rebuttal, the State called Rochelle Tempo, an employee at Moloka'i Alternatives to Violence to testify about the note and other oral statements that Lavoie made at that time. The defense objected on the grounds that the evidence had already been admitted through Dr. Acklin and further testimony about the statements would be cumulative and prejudicial. The prosecutor responded that the statement had not previously been admitted for substantive purposes and that it was now attempting to do so. The court overruled the objection and instructed the jury that the evidence, if believed, was to be "considered only on the issue of the defendant's intent to commit the offenses charged in this case."

Lavoie called Dr. Martin Blinder, who was qualified as an expert in the fields of "psychiatry, forensic psychiatry, and mental state at the time of the offense."[18]  Dr. Blinder diagnosed Lavoie with having post-traumatic encephalopathy caused by "head/brain injury due to multiple blows," post-traumatic stress disorder as a result of being sexually abused and physically assaulted throughout his lifetime, and schizophrenic spectrum disorder.  At the time of the shooting, Dr. Blinder testified, Lavoie experienced a dissociative episode and therefore had no useful judgment over his decision-making process.[19]

Dr. Blinder stated that the main stressor that contributed to Lavoie's dissociative episode was the pattern of inconsistency in his relationship with Kahalewai; in the months leading up to the shooting, the relationship was "hot and cold." Lavoie's "psychic survival depend[ed] on remaining connected to [Kahalewai], so [he went] through months and years of these increasing stressors rather than going out the door," Dr. Blinder testified.  And finally, Dr. Blinder said, "it reache[d]

---

[18]    Dr. Blinder testified that he was a licensed psychiatrist, was the chief of private inpatient psychiatric services at the University of California Hospital in San Francisco, and taught at University of California at Hastings law school for 17 years before his retirement.

[19]    Dr. Blinder testified that the fact Lavoie had a gun in his car that night was not necessarily reflective of a plan to commit the shooting. Dr. Blinder stated that Lavoie told him that the rifle was in the car because he was planning to sell it.

the point where after years of this, [Lavoie] flipped out." This culminated in gaps in Lavoie's memory on the night of the shooting, particularly after Kahalewai's friends began laughing at him, Dr. Blinder testified. As a result of Lavoie's dissociative episode, Dr. Blinder concluded, Lavoie knew the difference between right and wrong but lacked substantial capacity to conform his conduct to the requirements of the law.

After the defense rested its case, the State recalled Haliniak during its rebuttal case. During her rebuttal testimony, Haliniak testified about two additional incidents between Lavoie and Kahalewai. Before she was called, the parties and the judge had a bench conference where defense counsel objected to the admission of the two incidents. The prosecutor argued that the incidents rebutted the notion that the shooting came from a psychiatric disorder and showed an abusive relationship rather than a mental disorder. The court, in overruling Lavoie's objection, noted that defense counsel elicited opinions as to both the EMED and a lack of penal responsibility defenses, so the prosecution could be rebutting either.

The first incident, Haliniak said, occurred while she and Kahalewai were playing poker in Haliniak's house. Haliniak testified that Lavoie was sleeping upstairs at the time and came downstairs after the poker game awoke him. He "was very upset

that [Kahalewai] didn't wake him up to play," punched the beam that supported the porch, and tried to grab Kahalewai's arm while yelling at her in a "very loud, angry tone," Haliniak stated.

Haliniak also testified about an incident in the spring of 2012 when Haliniak stated she was picking up Kahalewai from school and Lavoie confronted Kahalewai. Haliniak said that Kahalewai told Lavoie that she did not want to talk to him so he grabbed her and head-butted her. Haliniak testified that Kahalewai then got into Haliniak's van and the two drove off while Lavoie was telling Kahalewai not to go with her.

The State also recalled Maikui to testify about a previously excluded incident in 2007 or 2008 when she saw Lavoie punch Kahalewai in his car. The defense objected that the incident was "extremely remote in time in relation to the [shooting]," prejudicial, and not probative. The court overruled the objection, stating that the incident would be admitted because, during Lavoie's case-in-chief, there was "a significant amount of testimony concerning the [E]MED [defense]." Maikui then testified that in 2007 or 2008, as she was driving by, she saw Lavoie punch Kahalewai in the arm. Maikui said that she turned her car around and took Kahalewai away from the scene.

There was no testimony that Kahalewai had separated from Lavoie after any of the incidents about which Haliniak or Maikui testified.

The State also called Dr. George Choi and Dr. Tom Cunningham from the court-ordered panel that had examined Lavoie. Both doctors were admitted as experts in the field of forensic psychology.[20] Based on his evaluation of Lavoie, Dr. Choi diagnosed him with substance abuse induced mood disorder. He testified that his opinion was based on the inconsistencies in Lavoie reporting his psychiatric symptoms to different people over time and Lavoie's tendency to over-report psychiatric symptoms. Dr. Choi stated that Lavoie's ability to control himself on the night of the shooting was impaired and his ability to know right from wrong in that moment was "moderately" impaired, but that Lavoie was not "substantially" impaired in his capacity to know right from wrong or conform his conduct to the law.

Dr. Cunningham opined that Lavoie was "malingering, exaggerating symptoms, or inventing them completely." Lavoie did not lack substantial capacity to appreciate the wrongfulness of his conduct, Dr. Cunningham testified, nor did he lack

---

[20] Dr. Choi testified that he was a licensed psychologist and had a private psychology practice. Dr. Cunningham stated that he was licensed in psychology and had worked at the Hawaiʻi State Health Department as a psychologist since 1988.

substantial capacity to conform his conduct to the requirements of the law. Dr. Cunningham said that he came to this conclusion because of "inconsistencies in the record" such as Lavoie's "auditory hallucinations." In Dr. Cunningham's opinion, Lavoie was very angry when he shot Kahalewai.[21]

The State also called Dr. Valli Kalei Kanuha to testify as an expert in the field of domestic violence. Dr. Kanuha stated that, in general, when there is an intimate relationship between a male and female, a man may abuse a woman because societal norms make the man think that he is the one in charge of the relationship and the woman should do what the man wants. Dr. Kanuha testified that batterers often view themselves as the victims and that it is common for a batterer to cry or beg when the partner threatens to leave the relationship.

At the conclusion of the evidence, the court instructed the jury that if it found that the State proved all elements of the charged offenses beyond a reasonable doubt, then

---

[21] Dr. Cunningham did not believe that Lavoie's family history of mental illness was a significant consideration, did not consider Lavoie's abuse by his father to be significant to his analysis, did not mention Lavoie's history of being sexually abused in his report, and did not consider it relevant that Lavoie was placed on suicide watch from March 22 through April 17, 2013 and again on August 5, 2013. In addition, Dr. Cunningham acknowledged that he did not review medical records of Lavoie's head injuries although they were provided to him. Dr. Cunningham also opined that Lavoie's anger was exacerbated by drinking during the day, although he acknowledged on cross-examination that there was no evidence in any of the police reports that Lavoie was intoxicated.

23

the jury must consider whether Lavoie was criminally responsible for his conduct.[22]  The court's instruction about prior bad acts stated the following:

> During this trial, you have heard evidence that the defendant at other times may have engaged in or committed crimes, wrongs or acts.  This evidence, if believed by you, may be considered only on the issue of defendant's intent to commit the offenses charged in this case.  Do not consider this evidence for any other purpose.  You must not use this evidence to conclude that because the defendant, at other times, may have engaged in or committed other crimes, wrongs or acts, that he is a person of bad character and, therefore, must have committed the offenses charged in this case.

The court instructed the jury that an EMED defense to murder has two elements: (1) that Lavoie was under the influence of EMED; and (2) there was a reasonable explanation for the EMED as determined from the viewpoint of a reasonable person under the circumstances that Lavoie believed them to be.  In addition, the court instructed the jury that Lavoie's "self-control or lack of it at the time of the offense is a significant factor in determining whether he was under the influence of [EMED]." Lavoie objected to this instruction, arguing that it unnecessarily highlighted and isolated self-control.

The court also instructed the jury as to the elements of the offenses of possession of a prohibited firearm (felon in

---

[22]  The court instructed the jury that "[t]he defendant is not criminally responsible for his conduct if, at the time of the offense and as a result of a physical or mental disease, disorder or defect, the defendant lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law."

possession) and place to keep loaded firearms (place to keep). As to the felon in possession offense, the jury was instructed that to convict Lavoie of this offense they must find that he knowingly possessed the firearm on March 20, 2013. As to the place to keep offense, the jury was informed that to convict Lavoie of this offense they must find that he intentionally possessed the loaded firearm on March 20, 2013, in a place other than in a place of business, residence, or sojourn. The court did not provide, nor did the parties request, a merger instruction.

Lavoie was found guilty as charged on all the offenses. On August 13, 2015, the circuit court denied Lavoie's Motion to Compel State to Dismiss Count 3 or 4 Due to Merger. The court ruled that there was no merger of the offenses because the felon in possession offense was committed prior to Lavoie leaving his home on March 20 and the place to keep offense occurred when the firearm was being transported to the scene of the shooting; thus, no merger instruction was required.

Lavoie was sentenced to a life sentence with the possibility of parole in Count 1, twenty years in prison in Count 2, and ten years in prison each in Count 3 and Count 4. The court ordered that Counts 1 and 2 be served concurrently, and Counts 3 and 4 be served consecutively to each other and consecutively to Counts 1 and 2. Lavoie appealed from the

judgment of conviction and sentence to the Intermediate Court of Appeals (ICA).

## II. ICA PROCEEDINGS

The ICA in its Memorandum Opinion first addressed Lavoie's objection to the lack of a jury instruction defining EMED. The ICA concluded that State v. Haili, 103 Hawai'i 89, 79 P.3d 1263 (2003), was dispositive because it held that EMED was not defined by the legislature, and thus the courts need not define it in their jury instructions. Further, the ICA stated that while HRS § 707-702(2) does not refer to self-control, Hawai'i courts have repeatedly recognized that it is a significant factor in EMED determinations.[23]

Turning to the merger instruction, the ICA acknowledged that "Hawai'i case law indicates that felon-in-possession and place-to-keep charges are often intertwined, in turn necessitating a merger instruction." However, the ICA agreed with the circuit court that the felon in possession offense was completed before Lavoie left his house on March 20,

---

[23]     HRS § 707-702(2) (1993 & Supp. 2003) provides as follows:

> (2) In a prosecution for murder or attempted murder in the first and second degrees it is an affirmative defense, which reduces the offense to manslaughter or attempted manslaughter, that the defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be.

2013, and the place to keep offense was committed when the firearm was placed in Lavoie's car.[24]  Thus, the ICA held that the circuit court did not err in failing to give a merger instruction.

The ICA also found no error in the circuit court's limiting instruction about the use of prior bad acts.  The ICA concluded that the jury instruction limited the jury's use of Lavoie's prior bad acts in compliance with Hawai'i Rules of Evidence (HRE) Rule 404(b), which permits prior bad acts if such evidence is probative of intent.  The ICA relied on State v. Maelega, 80 Hawai'i 172, 907 P.2d 758 (1995), and held that the prior bad acts were relevant to rebut Lavoie's EMED defense because such acts were probative of his intent.

Finally, the ICA affirmed the circuit court's determination that Lavoie opened the door to allow the State to elicit testimony of Lavoie's prior bad acts.  The ICA stated that the defense's cross-examination questions about arguments

---

[24]    The ICA quoted an unpublished ICA memorandum opinion stating that

> [Place to keep] is not defined as a continuing course of
> conduct; it is a prohibition against transporting firearms.
> Once the person takes the firearm out of a place of
> business, residence, or sojourn--but for certain
> exceptions--the offense is complete.  The fact that the
> offense may continue beyond this point does not change the
> character of the offense.

See State v. Lavoie, NO. CAAP-15-0000643, 2018 WL 4613329 (Haw. App. Apr. 23 2018) (quoting State v. Stangel, No. CAAP-13-0003941, 2015 WL 836928 (Haw. App. Feb. 26, 2015)).

27

between Lavoie and Kahalewai during the course of their relationship opened the door because the questions were relevant to Lavoie's EMED defense.  The ICA concluded that the circuit court did not err in ruling that the defense's line of questioning suggested that the separation between Lavoie and Kahalewai caused Lavoie to lose self-control, and that the jury would have to determine whether it was reasonable for Lavoie to lose self-control if his abuse led to the separation.

The ICA accordingly affirmed the judgment of the circuit court.[25]  Lavoie timely filed an application for writ of certiorari, which this court accepted.

### III. STANDARDS OF REVIEW

#### A. Conclusions of Law

Conclusions of law are reviewed de novo under the right/wrong standard of review.  Maria v. Freitas, 73 Haw. 266, 270, 832 P.2d 259, 262 (1992).

#### B. Jury Instructions

The propriety of jury instructions is a question of law reviewed de novo using the following standard: whether, "when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or

---

[25]    Lavoie also raised other issues on appeal that were rejected by the ICA but not raised on certiorari review; these issues are not discussed.

28

misleading." State v. Bovee, 139 Hawai'i 530, 537, 394 P.3d 760, 767 (2017) (quoting State v. Frisbee, 114 Hawai'i 76, 79, 156 P.3d 1182, 1185 (2007)).

## C. Prior Bad Acts

The admissibility of evidence requires different standards of review depending on the particular rule of evidence at issue. State v. Fetelee, 117 Hawai'i 53, 62, 175 P.3d 709, 718 (2008); State v. Pulse, 83 Hawai'i 229, 246, 925 P.2d 797, 814 (1996).

> "Prior bad act" evidence under [HRE] Rule 404(b) . . . is admissible when it is 1) relevant and 2) more probative than prejudicial. A trial court's determination that evidence is "relevant" within the meaning of HRE Rule 401 . . . is reviewed under the right/wrong standard of review. However, a trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 . . . is reviewed for abuse of discretion. An abuse of discretion occurs when the court clearly exceeds the bounds of reason or disregards rules or principles of law to the substantial detriment of a party litigant.

State v. Behrendt, 124 Hawai'i 90, 102, 237 P.3d 1156, 1168 (2010) (alterations in original).

## IV. DISCUSSION

Lavoie first argues that the evidence of prior bad acts was inadmissible because it did not rebut an EMED defense or a defense of lack of penal responsibility. Because such evidence is inadmissible, Lavoie contends, he could not have opened the door to admission of the prior bad acts.

A defendant can be relieved of penal responsibility if the defendant proves that "at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of the law."  HRS § 704-400(1) (1993).[26]

Additionally, HRS § 707-702(2) provides that EMED is a mitigating affirmative defense in a prosecution for murder that applies when the defendant was, at the time the defendant caused the death of another person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation.  The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be.  If this defense is proved, it reduces the offense of murder to manslaughter.  Id.

---

[26]     HRS § 704-400(1) provides as follows:

> (1) A person is not responsible, under this Code, for conduct if at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law.

### A. Lavoie's Prior Bad Acts

### 1. Lavoie Did Not "Open the Door" to Prior Instances of Abuse

Lavoie argues that the circuit court improperly ruled that he opened the door to prior acts by cross-examining Aea about prior instances in which Lavoie and Kahalewai separated.

"The 'opening the door' doctrine is essentially a rule of expanded relevancy . . . ." State v. James, 677 A.2d 734, 742 (N.J. 1996). "Under this doctrine, when one party introduces inadmissible evidence, the opposing party may respond by introducing [] inadmissible evidence on the same issue." State v. Fukusaku, 85 Hawaiʻi 462, 497, 946 P.2d 32, 67 (1997)[27]; see also State v. Dvorak, 295 S.W.3d 493, 502 (Mo. Ct. App. E.D. 2009) (the doctrine applies after one party introduces inadmissible evidence).  Admissible evidence therefore does not 'open the door' to otherwise inadmissible evidence. State v. Middleton, 998 S.W.2d 520, 528 (Mo. 1999) ("A party may not, however, introduce inadmissible evidence to rebut inferences

---

[27]  The "opening the door doctrine" is also sometimes referred to as the doctrine of "curative admissibility."  In Fukusaku, we stated that

> [a]lthough the Prosecution cites no authority, its argument appears to be based on the doctrine of "curative admissibility," also known as "opening the door" or "fighting fire with fire." Under this doctrine, when one party introduces inadmissible evidence, the opposing party may respond by introducing his own inadmissible evidence on the same issue.

85 Hawaiʻi at 496, 946 P.2d at 67 (1997).  The Fukusaku court referred to the doctrines of "opening the door" and "curative admissibility" interchangeably. We will also do so in this opinion, although it is noted that not all jurisdictions treat the doctrines with a singular meaning.

raised by the introduction of admissible evidence during cross-examination.").

Here, during cross-examination, Aea was asked whether she was "aware that [Kahalewai] would leave [Lavoie], leave the family, and go stay at friends' houses" after arguments between Kahalewai and Lavoie. Aea responded that she was aware of the past arguments and separations. On redirect, Aea clarified that the arguments leading to the separations generally involved Kahalewai's desire to socialize with her friends, which was typically not possible because there was neither internet nor phone service at the home that she shared with Lavoie in Honouliwai Valley.

Based on defense counsel's questioning, the circuit court admitted into evidence six prior incidents of abuse that it had previously ruled inadmissible, reasoning that the door had been opened by Aea's testimony. First, Aea testified that six years prior to the shooting, she witnessed Lavoie threaten Kahalewai with a gardening pick. There was no testimony, however, that this incident resulted in Kahalewai leaving Lavoie for any period of time. Second, Alexis testified that she saw Lavoie choke Kahalewai roughly eight to ten months before the shooting. Again, there was no testimony that Kahalewai left Lavoie as a result of this incident. Testimony regarding two more incidents of abuse that occurred in the year prior to the

32

shooting was elicited from Haliniak, including a time when Lavoie punched a beam and yelled at Kahalewai while trying to grab her arm and an instance in which Lavoie head-butted Kahalewai. There was no testimony that either of these incidents resulted in Kahalewai leaving Lavoie. And Maikui testified during the State's rebuttal that six years before the shooting, she saw Lavoie punch Kahalewai in the arm. Once again, the witness did not testify that this incident resulted in Kahalewai leaving Lavoie.

Each of these instances garnered objections from defense counsel, who argued that, because there was no clear connection between the instances of abuse and the arguments between Lavoie and Kahalewai that led to the previous separations, the testimony was irrelevant and unfairly prejudicial. Only the March 16, 2013 incident that led to the separation between Lavoie and Kahalewai immediately preceding the shooting was not objected to. Because this incident did result in a separation, defense counsel appears to have implicitly conceded that it was relevant to the reasonableness of Lavoie's EMED resulting from the separation.

As stated, the opening the door doctrine generally does not allow a party to admit evidence that is otherwise inadmissible to rebut an opponent's relevant and admissible evidence. Clark v. State, 629 A.2d 1239, 1244 (Md. 1993). This

court previously addressed a similar issue in State v. Fukusaku, 85 Hawai'i 462, 496, 946 P.2d 32, 66 (1997). In Fukusaku, the trial court ruled that expert testimony about positive luminol and phenolphthalein test results indicating the presence of blood in some areas of a defendant's apartment was inadmissible because, in the absence of secondary confirmation tests, the luminol and phenolphthalein tests were not relevant.[28] Id. On cross-examination, defense counsel elicited testimony from the expert about the absence of blood on any of the cushions in the defendant's apartment. Id. The State argued that the defense had opened the door to the previously inadmissible positive test results by questioning the expert about blood samples. Id. The circuit court ruled that the defense had not opened the door. Id.

This court, in affirming the circuit court, concluded that general testimony about the nonpresence of blood samples-- which was admissible on its own--did not open the door to testimony about the inadmissible positive test results. Id. at 497, 946 P.2d at 67. This court construed the State's argument as an appeal to the doctrine of "curative admissibility," under

---

[28] The tests at issue could generate false positive reactions, could not distinguish between animal blood and human blood, and could not determine how long the blood had been at the scene. Fukusaku, 85 Hawai'i at 496, 946 P.2d at 66. No evidence was offered that the tests were likely to render false negatives. Id. at 497, 946 P.2d at 67.

which "when one party introduces inadmissible evidence, the opposing party may respond by introducing his own inadmissible evidence on the same issue." Id. We noted that this doctrine, often referred to as "fighting fire with fire," is subject to abuse and "most jurisdictions have limited its use to situations in which the originally submitted evidence creates significant prejudice." Id. (citing 1 Wigmore on Evidence § 15, at 741-42 & n.6 (1983)). This court then ruled that, because the testimony elicited by defense counsel regarded negative test results, which had not been shown to be unreliable and which the trial court expressly ruled were not covered by its exclusion order, the testimony was admissible. Id. We therefore concluded that "even if we were to adopt the doctrine of curative admissibility, it would not be applicable to the present case." Id.

Parallels may be drawn between Fukusaku and the case at hand. Here, the circuit court's ruling on Lavoie's motion in limine specifically excluded evidence involving allegations of prior violence in much the same manner as the trial court's order in Fukusaku excluded evidence of positive test results. And, like the negative test results in Fukusaku, evidence of previous arguments between Lavoie and Kahalewai that led to separations and did not involve violent acts by Lavoie were not within the ambit of the court's order. Thus, as in Fukusaku,

35

Lavoie "introduced <u>admissible</u> evidence, not <u>inadmissible</u> evidence," and the doctrine of curative admissibility is simply inapplicable to the present case.[29]  <u>Id.</u>

The State cites authority from other jurisdictions for the proposition that the door may also be opened to inadmissible evidence when a party offers admissible evidence that is false or misleading if considered in isolation.[30]

As an initial matter, this court may have implicitly rejected the rule the State argues for in <u>Fukusaku</u>, in which the State appeared to contend that the defendant had presented incomplete and misleading testimony by focusing on the lack of blood on the cushions in his apartment while not acknowledging that the luminol and phenolphthalein tests had indicated that

---

[29]  Our discussion of the "opening the door" doctrine addresses the situation in which inadmissible evidence is offered in response to the introduction of admissible evidence.  The doctrine has also been applied to authorize the introduction of evidence that would otherwise have been irrelevant in order to respond to admissible evidence that generates an issue.  <u>See, e.g.</u>, <u>Clark</u>, 629 A.2d at 1242-43.  Because we conclude in this case that the testimony about prior incidents of abuse is inadmissible, <u>see</u> <u>infra</u> Part IV.A.2 and Part IV.A.3, it is not necessary to consider adoption of this variant of the curative admissibility doctrine or of the doctrine itself because even if we were to do so, "it would not be applicable to the present case."  <u>See</u> <u>Fukusaku</u>, 85 Hawai'i at 497, 946 P.2d at 67.

[30]  <u>See, e.g.</u>, <u>Valadez v. Watkins Motor Lines, Inc.</u>, 758 F.3d 975, 981 (8th Cir. 2014) (holding that a party may open the door to inadmissible evidence to the extent that the inadmissible evidence "clear[s] up [a] false impression" or "clarify[ies] or complete[s] an issue opened up by [opposing] counsel") (last alteration in original); <u>United States v. Osazuwa</u>, 564 F.3d 1169, 1175 (9th Cir. 2009) (same); <u>United States v. Brown</u>, 921 F.2d 1304, 1307 (D.C. Cir. 1990) (same); <u>State v. Carlson</u>, 146 N.H. 52, 56 (2001) (same).  The ICA, in an unpublished memorandum opinion, has adopted such a rule.  <u>See</u> <u>State v. Awana</u>, No. 27145, 2007 WL 1139407 at *14 (Haw. App. Apr. 13, 2007) ("As an evidentiary principle, the 'opening the door' doctrine allows the admission of otherwise inadmissible evidence, including hearsay, to qualify, explain, or limit testimony or evidence previously elicited.").

blood may have been present elsewhere in the apartment.

85 Hawai'i at 496, 946 P.2d at 66. Additionally, such a rule would not apply here even if this court were to adopt it because no aspect of Aea's testimony was shown to be false or misleading. Aea testified generally on cross-examination about Lavoie and Kahalewai's prior arguments that led to periods of separation, which generally involved Kahalewai's desire to socialize with her friends. None of the incidents of abuse elicited over defense objection contradicted or clarified Aea's testimony because it was never shown that the incidents had any relation to the separation-causing arguments about which Aea had testified. Thus, because there is no indication that Aea's testimony was likely to convey a false impression, it is unnecessary for this court to consider a situation in which admissible evidence is so misleading that it would justify the admission of otherwise inadmissible evidence to correct it.[31]

We have held that admissible evidence--here, Aea's testimony about Lavoie and Kahalewai's previous arguments that led to periods of separation and did not clearly involve incidents of abuse--generally does not open the door to inadmissible evidence, see 85 Hawai'i at 496, 946 P.2d at 66, and

---

[31] Because the opening the door doctrine does not apply here, we decline to address Lavoie's contention that the door may only be opened during the defendant's case-in-chief.

no possible exception to this rule applies. Thus, the admissibility of the testimony regarding Lavoie's prior bad acts must be evaluated on its own merit, and not in relation to Aea's testimony.

## 2. The Prior Bad Acts Were Inadmissible to Rebut Lavoie's EMED Defense

The circuit court ruled that evidence of Lavoie's prior bad acts was admissible to rebut Lavoie's EMED defense. The circuit court reasoned that a central issue in the case was whether Lavoie was experiencing EMED when the shooting occurred, and, if so, whether the EMED Lavoie experienced was a reasonable response to, inter alia, Kahalewai having left him. The court stated that "[c]ausing the loss of a partner by acts of physical abuse, and then saying you're overwhelmed by that . . . may not be viewed as reasonable." Thus, the court ruled that the prior incidents "carrie[d] significant probative value concerning the reasonableness of the explanation."

This court's decision in State v. Castro is highly informative in deciding the present issue. In Castro, the defendant was convicted of attempted murder and assault in the second degree after he tried to kill his estranged girlfriend. 69 Haw. 633, 639-42, 756 P.2d 1033, 1039-40 (1988). At trial, the defendant asserted that he was under the influence of EMED and that there was a reasonable explanation for his EMED at the

time the offense was committed.  Id. at 641, 756 P.2d at 1040.

The trial court admitted testimony about several prior incidents

when the defendant committed acts of violence against the victim

to demonstrate the defendant's "intent, preparation, plan,

knowledge, and modus operandi" regarding the attempted murder.

Id. at 644, 756 P.2d at 1042.

On review, this court vacated the conviction, holding

that, when the identity of the perpetrator is not in doubt,

there is very little justification for admitting evidence of a

defendant's prior bad acts under HRE Rule 404(b) to demonstrate

the defendants plan, preparation, knowledge, or modus operandi.

Id. at 645, 756 P.2d at 1042.  We held that, even if the prior

acts had some "incremental probative value" with regard to the

defendant's state of mind when the offense was committed, they

were nonetheless inadmissible under HRE Rule 403 because their

relevancy was far outweighed by their potential for unfair

prejudice.  Id. at 645, 756 P.2d at 1042.  This court explained

that the prior bad acts were not needed to prove intent because

"there was much more from which an inference of intentional

conduct could be drawn in the evidence of the offense for which

the defendant was being tried."  Id. at 644, 756 P.2d at 1042.

Instead of following this court's precedent in Castro,

the ICA relied on State v. Maelega in affirming the circuit

court.  In Maelega, this court held that the circuit court did

not abuse its discretion in admitting evidence of a defendant's past abuse of his wife. 80 Hawai'i 172, 184, 907 P.2d 758, 770 (1995). The State introduced instances of abuse to show that the defendant was trying to control or discipline his wife at the time of the offense and that he had not lost self-control under EMED. Id. at 175 n.3, 907 P.2d at 761 n.3.

The circuit court concluded, and we agreed, that the prior bad acts were probative to rebut both prongs of EMED; the acts "tend[ed] to show that [Maelega] acted with self-control at the time that he allegedly killed his wife" and that "even if [Maelega] did not act with self-control, then there was no 'reasonable explanation' for his extreme mental or emotional disturbance." Id. at 184, 907 P.2d at 770. This court relied on the trial court's findings of fact that (1) "very little time [] elapsed between the prior act evidence and the [] charged offense," (2) there was a "great need" for the evidence to scrutinize the relationship between the defendant and the victim, and (3) the prior acts were not "of the nature which will rouse the jury to overmastering hostility." Id. at 183-84, 907 P.2d at 769-70 (emphases omitted).

Here, as in Castro, the evidence of Lavoie's prior abuse had little, if any, probative value as to his state of mind at the time of the shooting or to its reasonableness. Lavoie's EMED defense stemmed from the stress that he felt after

40

Kahalewai said she would leave him, coupled with Kahalewai's insults and references to his childhood sexual trauma immediately prior to the shooting. The evidence of his prior abuse of Kahalewai was not probative of the presence or reasonableness of Lavoie's EMED because the witnesses testifying to the incidents did not link the abuse to Kahalewai leaving Lavoie. Absent such a link, Lavoie's prior bad acts were not relevant to the reasonableness of Lavoie's EMED at the time of the shooting.

Unlike in Maelega, the State did not establish a direct link between Lavoie's prior bad acts and the killing because the State did not provide any direct testimony indicating that the incidents of abuse were evidence that was incompatible with EMED in this case. Id. at 175 n.3, 907 P.2d at 761 n.3. Further, the court in Maelega relied in part on the fact that "very little time" had elapsed between the prior bad acts evidence and the charged offense; in fact, all of the instances of abuse occurred within four months of the incident. Id. at 174, 183, 907 P.2d at 760, 769. The instances of Lavoie's abuse, by contrast, date as far back as six years before the offense.

Out of the six prior instances of abuse that the State elicited, only one--the March 16 incident that led to the separation that immediately preceded the shooting--was linked to

a separation between Lavoie and Kahalewai.  In the absence of evidence that the other instances of abuse were a motivating factor in Kahalewai's leaving, the incidents had no bearing on whether Lavoie was extremely emotionally disturbed as a result of the separation and, if so, whether that disturbance was a reasonable reaction.  Thus, these prior acts were not relevant to rebut an EMED defense.

Even if this court were to hold that these instances of abuse had some slight relevancy to Lavoie's EMED defense and were thus admissible under HRE Rule 404(b), they should nonetheless have been excluded under HRE Rule 403.  When prior bad acts are relevant to prove a fact of consequence, "the trial court is still obliged to exclude the evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" Castro, 69 Haw. at 643, 756 P.2d at 1041 (quoting HRE Rule 403). Thus, were we to conclude that the incidents of abuse were a motivating factor that led Kahalewai to separate from Lavoie--a fact for which there is no clear evidence in the record--the incidents would still be of only marginal probative value because they represent only one reason out of many for Kahalewai's dissatisfaction.  Indeed, Aea testified that the separations were primarily caused by other factors, including Kahalewai's desire for "space," to "hang out with friends," and

to "do her own thing," which was made particularly difficult given the remote location and lack of phone and internet service in the home she shared with Lavoie.

On the other hand, evidence of the prior abuse had a great potential for unfair prejudice to Lavoie because there is a danger that a jury would consider the instances of abuse as propensity evidence, inferring that because Lavoie had committed abuse in the past, he was acting in the same manner when he shot Kahalewai. Such an inference is expressly prohibited under HRE Rule 404(b). Further, given the justifiable stigma attached to domestic abusers in the eyes of the public, evidence that Lavoie had committed domestic abuse was highly likely to "rouse the jury to overmastering hostility" towards him. State v. Renon, 73 Haw. 23, 38, 828 P.2d 1266, 1273 (1992). As we held in Castro, the testimony should have been excluded even if it bore some slight relevance as to the presence or reasonableness of Lavoie's EMED because it was far more prejudicial than it was probative.

### 3. The Prior Bad Acts Were Inadmissible to Rebut Lavoie's Lack of Penal Responsibility Defense

At several points during the trial in this case, the circuit court suggested that Lavoie's prior bad acts were potentially relevant to rebut his lack of penal responsibility defense. This court has not foreclosed the use of prior bad

acts evidence to rebut a lack of penal responsibility defense. See State v. Morishige, 65 Haw. 354, 365, 652 P.2d 1119, 1127-28 (1982) (affirming the admission of expert testimony of the defendant's criminal history to show that the defendant had an "anti-social personality" rather than a mental disorder).

Here, however, the prior bad acts had no probative value to rebut Lavoie's lack of penal responsibility defense because, unlike in Morishige, the incidents were not introduced through expert testimony to refute a diagnosis of a mental disorder or lack of capacity, and there was accordingly no showing that the abuse was inconsistent with any aspect of Lavoie's lack of penal responsibility defense. We expressly noted in Morishige that the testimony was not offered to show propensity, but rather was "elicited to rebut a clinical psychologist called by the defense who testified the defendant was suffering from an acute mental disorder that 'prevented him from knowing right from wrong' and 'from conforming his behavior to the requirements of the law.'" Id. at 364-65, 652 P.2d at 1127. In this case, testimony regarding Lavoie's prior bad acts may have been admissible had the State first elicited it from the defense's expert witnesses on cross-examination for the purpose of demonstrating that the underlying bases of the experts' diagnoses of Lavoie were incomplete or did not support

their conclusions.[32]  See HRE Rule 704.  In fact, the State did
so during its cross-examination of Dr. Acklin, questioning
whether he was aware of the specific instance of abuse that
precipitated the separation immediately prior to the shooting.
Alternatively, the instances may have been referenced through
the testimony of the State's own experts as a basis for their
contrary diagnoses.[33]

The acts of abuse did not serve to rebut Lavoie's
experts' diagnoses, however.  Several of the instances of abuse
were introduced during the State's case-in-chief, before
Lavoie's experts testified.  Moreover, there was never any
showing that the instances of abuse were inconsistent with the
defense's or the State's experts' diagnoses.  Indeed, Dr. Acklin
testified that the instance of abuse that caused the separation
immediately preceding the shooting and the other prior instances
of abuse of which he was aware were wholly consistent with his

---

[32]    The State itself acknowledged the distinction between offering
prior misconduct to challenge the underlying bases of the expert opinions and
its use for other purposes when the State distinguished between its initial
proffer of the note during the cross-examination of Dr. Acklin and its
subsequent proffer to admit the note incident for substantive purposes during
the testimony of Tempo on rebuttal.

[33]    In either case, the evidence would have been subject to HRE Rule
403 balancing, and, if admitted, a limiting instruction restricting its use
to the evaluation of the reliability of the expert witnesses' testimony.
When the note was introduced on cross-examination of Dr. Acklin, the court
informed the jury that it was being offered "in connection with the expert's
opinion," but nevertheless instructed the jury that it was to consider the
evidence on the substantive issue of "the defendant's intent" rather than the
reliability of Dr. Acklin's testimony.

diagnosis.  And the State's own expert witnesses gave no indication that the past instances of abuse figured into their conclusion that Lavoie did not suffer from a mental disorder or lack substantial capacity.  Without such a link, the past incidents of abuse had no probative value to rebut Lavoie's lack of penal responsibility defense.[34]  Instead, they served only as an argument that Lavoie was "by propensity a probable perpetrator"--a use this court expressly condemned in Morishige. 65 Haw. at 364, 652 P.2d at 1127 (citation omitted).

The admission of the prior instances of abuse on the issue of Lavoie's lack of penal responsibility defense had a great potential to confuse or unfairly prejudice the jury against Lavoie.  For example, the jury may have considered whether Lavoie had a mental disorder or had substantial capacity during the prior incidents and assumed that Lavoie was in the same condition on the night of the shooting.  Such an inference would lack an evidentiary basis, and it would likely be an inference of propensity prohibited under HRE Rule 404(b).  And, as stated, the justifiable stigma attached to domestic abusers in the eyes of the general public had the potential to engender

---

[34]  Were we to conclude that the instances of abuse in this case were relevant to rebut Lavoie's lack of penal responsibility defense, the same reasoning would allow the introduction of all of a defendant's prior bad acts through lay witnesses any time a lack of penal responsibility defense is raised.  Such a rule would be contrary to the plain text of HRE Rule 404(b) and the circuit court's own initial ruling on Lavoie's motion in limine.

anger against Lavoie, leading the jury to decide the case on the basis of his character rather than the applicable factual and legal issues.  Renon, 73 Haw. at 38, 828 P.2d at 1273.  Thus, even assuming arguendo that the prior instances of abuse were admissible under HRE Rule 404(b) to rebut Lavoie's lack of penal responsibility defense, they should have been excluded under HRE Rule 403 because their marginal probative value was substantially outweighed by the danger that the jury would improperly misuse the prior acts.  Accordingly, the circuit court erred in admitting the prior incidents of misconduct, and the ICA erred in affirming these rulings of the circuit court.

## 4. Admission of the Prior Bad Acts Was Not Harmless Beyond a Reasonable Doubt

In considering whether the erroneous admission of evidence of a defendant's prior bad acts warrants setting aside a defendant's conviction, this court considers whether the error was harmless beyond a reasonable doubt.  State v. Kazanas, 138 Hawaiʻi 23, 43, 375 P.3d 1261, 1281 (2016).  An error is not harmless beyond a reasonable doubt if, upon review of the record as a whole, there is a reasonable possibility that the error might have contributed to the defendant's conviction.  State v. Souza, 142 Hawaiʻi 390, 402, 420 P.3d 321, 333 (2018); State v. Wilson, 144 Hawaiʻi 454, 465, 445 P.3d 35, 46 (2019); State v. Torres, 144 Hawaiʻi 282, 291, 439 P.3d 234, 243 (2019).

47

This is not a case "[w]here there is a wealth of overwhelming and compelling evidence tending to" disprove the defendant's EMED and lack of penal responsibility affirmative defenses. Cf. State v. Toyomura, 80 Hawai'i 8, 27, 904 P.2d 893, 912 (1995) (quoting State v. Nakamura, 65 Haw. 74, 80, 648 P.2d 183, 187 (1982)). Lavoie presented three highly qualified expert witnesses that testified that, in their professional opinion, Lavoie met the requirements for the lack of penal responsibility defense. Two of the expert witnesses also concluded that he was experiencing EMED at the time of the shooting.[35]

Further, there was significant reason for the jury to potentially doubt the State's own experts who presented contrary testimony. Dr. Choi acknowledged that Lavoie suffered from a mental disorder and that his ability to control himself and to know right from wrong on the night of the shooting was "moderately" impaired. Dr. Choi simply disputed that the impairment was sufficiently severe to qualify as "substantial." And Dr. Cunningham stated that he did not include in his report a range of factors that the other experts found highly relevant to their diagnoses, including Lavoie's family mental illness history, Lavoie's abuse by his father, Lavoie's history of being

---

[35] Indeed, even the State in its closing argument described Dr. Acklin as the most experienced and the most prepared of the expert witnesses.

sexually abused, and that Lavoie was placed on suicide watch following the shooting.

On this evidentiary record, there is a clear possibility that any impermissible inferences that the jury made from the wrongfully admitted prior instances of abuse colored their evaluation of Lavoie's defenses of lack of penal responsibility and EMED. Additionally, the jury's verdict may have been influenced by resentment engendered by the wrongfully admitted prior instances of domestic abuse. In either circumstance, there is a "reasonable possibility" that the circuit court's error in admitting the incidents of prior abuse may have contributed to Lavoie's conviction. Souza, 142 Hawai'i at 402, 420 P.3d at 333. The error was accordingly not harmless beyond a reasonable doubt.

## 5. The Circuit Court Improperly Instructed the Jury on the Use of the Prior Bad Acts

Lavoie also argues that the limiting instruction that the circuit court gave regarding the use of the prior acts improperly allowed the jury to consider the prior misconduct on issues for which it was not relevant.[36] As stated, the court's instruction provided as follows:

---

[36] While it is unnecessary in light of our disposition to resolve whether the limiting instructions were plainly erroneous, we address their propriety to provide guidance to the trial court on remand.

> During this trial, you have heard evidence that the
> defendant at other times may have engaged in or committed
> crimes, wrongs or acts. This evidence, if believed by you,
> may be considered only on the issue of defendant's intent
> to commit the offenses charged in this case. Do not
> consider this evidence for any other purpose. You must not
> use this evidence to conclude that because the defendant,
> at other times, may have engaged in or committed other
> crimes, wrongs or acts, that he is a person of bad
> character and, therefore, must have committed the offenses
> charged in this case.

The court gave some variation of this instruction four times throughout the trial: when the State rested its case-in-chief, during the cross-examination of Dr. Acklin,[37] during the direct-examination on rebuttal of Rochelle Tempo, and immediately prior to the State's closing argument.

The instruction was an incorrect statement of the matters on which the circuit court had ruled the prior bad acts were relevant. The court ruled that the prior acts of abuse were admissible to rebut Lavoie's EMED and lack of penal responsibility affirmative defenses. A defendant's intent, however--as distinguished from other aspects of the defendant's state of mind--is not a relevant consideration with respect to either defense. This is because a jury does not consider an EMED or lack of penal responsibility defense unless and until it has first determined that the State has proven all the elements of the charged offense beyond a reasonable doubt, including that

---

[37] Although the circuit court's language varied somewhat in the limiting instruction that it gave during Dr. Acklin's testimony, the instruction still informed the jury that it was permitted to use the acts to determine the defendant's intent. See supra note 33.

the defendant acted with the requisite intent.  See Hawai'i Standard Jury Instruction Criminal (HAWJIC) 7.07 ("Before you may consider this affirmative defense, you must first determine whether the prosecution has proven all elements of [the charged offense] beyond a reasonable doubt."); HAWJIC 9.08 ("If and only if you unanimously find that all the elements of [the murder charge] have been proven by the prosecution beyond a reasonable doubt . . . then you must consider whether, at the time defendant caused the death, he/she was under the influence of [EMED] for which there is a reasonable explanation.").  In other words, by the time the jury considers whether the elements of an EMED or lack of penal responsibility defense are met in a murder trial, it has already determined that the defendant acted intentionally or knowingly in causing the death of another person.  See HRS § 707-701.5.

The circuit court appears to have merged Lavoie's "intent" with his mental condition generally, aspects of which were relevant to his EMED and lack of penal responsibility defenses.  As discussed, whether Lavoie was under the influence of EMED or a mental disorder that resulted in a lack of substantial capacity were elements of the respective affirmative defenses.  However, neither of these considerations fall within the plain meaning of the term "intent".  See Black's Legal Dictionary 964 (11th ed. 2019) ("[T]he mental resolution or

determination to do [an act].").[38]  Further, the court ruled with respect to the EMED defense that the bad acts were probative not only of whether Lavoie was under the influence of EMED but also the separate issue of whether EMED was a reasonable reaction given the circumstances.  Even were we to construe intent to refer to Lavoie's general mental condition, the reasonableness of the explanation for the EMED was an objective inquiry under the circumstances as Lavoie believed them to be--separate from Lavoie's subjective mental state at the time of the offense.  Accordingly, the court's instruction informing the jury that it could consider the prior bad acts to show Lavoie's intent was problematic in multiple respects.[39]

---

[38]    HRS § 702-206 (1993) provides as follows:

Definitions of states of mind.  (1) "Intentionally."
(a)  A person acts intentionally with respect to his conduct when it is his conscious object to engage in such conduct.
(b)  A person acts intentionally with respect to attendant circumstances when he is aware of the existence of such circumstances or believes or hopes that they exist.
(c)  A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result.

[39]    The circuit court may have derived the language of its instruction from HRE Rule 404(b), which permits the use of evidence of other crimes, wrongs, or acts to prove a "fact that is of consequence to the determination of the action, such as . . . intent."  The enumerated examples of facts of consequence included in HRE Rule 404(b) are not exhaustive, however, and the limiting instruction should have been tailored to the specific determination to which the court deemed the prior bad acts were relevant.

## B. The Circuit Court Was Not Required to Give a Jury Instruction Defining EMED

Lavoie argues that the EMED instructions given to the jury did not properly define EMED and unnecessarily highlighted and isolated self-control so as to effectively create an additional element to prove the defense. The circuit court provided the jury with the following instruction:

> Extreme mental or emotional disturbance has two elements. These elements are: One, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance. And two, there was a reasonable explanation for the extreme mental or emotional disturbance.

In addition, the court instructed the jury that, "The question of the defendant's self control or the lack of it at the time of the offense is a significant factor in deciding whether he was under the influence of extreme mental or emotional disturbance" (self-control instruction).

In State v. Haili, the defendant similarly argued that circuit courts must provide the jury with a definition of EMED. 103 Hawai'i 89, 107, 79 P.3d 1263, 1281 (2003). We rejected the defendant's argument and observed that the Hawai'i Legislature has not defined EMED, and accordingly "the circuit courts need not define the term when instructing the jury; instead, the jury is to give the phrase its plain meaning." Id. at 108, 79 P.3d at 1282; see also Roxas v. Marcos, 89 Hawai'i 91, 148, 969 P.2d 1209, 1266 (1998) (noting that the jury instructions given did

not include the legal definitions of "defraud" or "deceit," and presuming that the jury accordingly applied the commonly understood meaning of those terms).  We thus concluded that the circuit court correctly refused to define EMED.  Haili, 103 Hawaiʻi at 109, 79 P.3d at 1283.

Additionally, the circuit court provided the jury with a self-control instruction in Haili that was identical to the one given in this case.  See id. at 107, 79 P.3d at 1281.  We held that the circuit court did not err in providing the jury with a self-control instruction because self-control is a "significant, even determining, factor in deciding whether the [defendant] was under the influence of an extreme emotional disturbance such that [the defendant's] conduct would fall under HRS § 707-702(2)." Id. at 108, 79 P.3d at 1282 (quoting State v. Matias, 74 Haw. 197, 204, 840 P.2d 374, 378); see also State v. Perez, 90 Hawaiʻi 65, 74, 976 P.2d 379, 388 (1999).

We thus conclude that the circuit court's EMED instructions in this case were not prejudicially insufficient.[40] See Haili, 103 Hawaiʻi at 108, 79 P.3d at 1282.

---

[40]    Lavoie contends that the following instruction should also have been submitted to the jury:

> An extreme mental or emotional disturbance is the emotional
> state of an individual, who has an extreme emotional
> reaction to an unusual and overwhelming stress as a result
> of which there is a loss of self-control and reason is
>                                          (continued . . .)

54

## C. The Circuit Court Should Have Given a Merger Instruction

Lavoie contends that the circuit court plainly erred in not providing the jury with a merger instruction because the same factual incident comprised both the felon in possession and place to keep offenses, the acts occurred at the same time, and they were committed with the same intent.

Generally, "[w]hen the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element." HRS § 701-109(1) (1993). A "defendant may not, however, be convicted of more than one offense if . . . [t]he offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses."[41] HRS § 701-109(1)(e). Thus, this court has

---

(. . . continued)

> overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation or similar emotions.

(Emphasis added.) Lavoie's proposed instruction incorrectly indicated requirements for an EMED defense that are not included in HRS § 707-702(2). Specifically, Lavoie's proposed instruction requires a showing that the defendant had been exposed to "an extremely unusual and overwhelming stress." As we stated in State v. Seguritan, "No such provision appears in the statute." 70 Haw. 173, 174, 766 P.2d 128, 129 (1988). Additionally, the proposed instruction denotes an emotional state that "as a result of which there is a loss of self-control and reason is overborne," which is also not a statutory requirement. Thus, the circuit court was not required to provide the jury with Lavoie's proposed EMED instruction.

[41] The purpose of this statute is to "limit the possibility of multiple convictions and extended sentences when the defendant has basically
(continued . . .)

concluded that only one crime is committed when "(1) there is but one intention, one general impulse, and one plan, (2) the two offenses are part and parcel of a continuing and uninterrupted course of conduct, and (3) the law does not provide that specific periods of conduct constitute separate offenses."  State v. Hoey, 77 Hawai'i 17, 38, 881 P.2d 504, 525 (1994).

Whether a particular criminal offense can be charged as a continuous offense is a question of law.  State v. Decoite, 132 Hawai'i 436, 442, 323 P.3d 80, 86 (2014) (Pollack, J., dissenting); see also Hoey, 77 Hawai'i at 38, 881 P.2d at 525 ("It is possible for kidnapping and robbery charges against a defendant to merge, pursuant to HRS § 701-109(e)[.]").  Accordingly, "[a]n offense that may be charged as a continuing offense permits culpable acts to be charged as separate offenses or as a continuing offense."  Decoite, 132 Hawai'i at 442, 323 P.3d at 86 (Pollack, J., dissenting) (emphasis omitted).

The test for whether a crime can be charged as a continuous offense is whether the statute precludes charging an offense as a continuous offense, and whether the element(s) of

---

(. . . continued)

engaged in only one course of criminal conduct directed at one criminal goal."  HRS § 701-109 cmt.

the offense may constitute a continuous, unlawful act or series of acts, however long a time the act or acts may occur. See id. at 438, 323 P.3d at 82 (majority opinion) (citing State v. Arceo, 84 Hawai'i 1, 18-19, 928 P.2d 843, 860-61 (1996)); State v. Apao, 95 Hawai'i 440, 447, 24 P.3d 32, 39 (2001) (holding that a crime may be charged as a continuing offense if, inter alia, "the offense is not defined in such a manner as to preclude it from being proved as a continuous offense"); State v. Temple, 65 Haw. 261, 267 n.6, 650 P.2d 1358, 1362 n.6 (1982) ("A continuing offense is a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy . . . ." (emphasis omitted)); State v. Martin, 62 Haw. 364, 371-72, 616 P.2d 193, 198 (1980) (holding that theft was a continuous offense because the language of the theft statute reflected a legislative intent to prohibit continuing conduct "since two elements of the pertinent crime . . . involve conduct that can extend beyond isolated moments").[42]

---

[42]     Our case law has recognized several offenses that could be charged as continuous offenses. See, e.g., State v. Yokota, 143 Hawai'i 200, 207, 426 P.3d 424, 431 (2018) (holding that forgery could be charged as a continuous offense); State v. Stenger, 122 Hawai'i 271, 289, 226 P.3d 441, 459 (2010) (holding that theft by deception is a continuous offense); State v. Rapoza, 95 Hawai'i 321, 329, 22 P.3d 968, 976 (2001) (holding that attempted murder in the second degree could be charged as a continuous offense); Hoey, 77 Hawai'i at 38, 881 P.2d at 525 (holding that robbery is a continuous offense); Martin, 62 Haw. at 369, 616 P.2d at 197 (holding that theft is a continuous offense).

If the statute provides that distinct acts constitute separate offenses, then conduct may not be charged as a continuous offense. For example, in the context of sexual assault, the legislature has prescribed that "each act of sexual penetration shall constitute a separate offense." HRS § 707-700 (2014 & Supp. 2016); see also Arceo, 84 Hawaiʻi at 16, 928 P.2d at 858 ("Multiple sex acts do not merge into a single continuing offense because the defendant can be convicted and punished for each separate act." (emphasis omitted)). Thus, this test involves two prongs: first, whether the statutory language prohibits charging the offense as a continuous offense, and second, whether an element of the offense can "extend beyond isolated moments." Martin, 62 Haw. at 371-72, 616 P.2d at 198.

In State v. Matias, the defendant was convicted of felon in possession and place to keep. 102 Hawaiʻi 300, 75 P.3d 1191 (2003). We vacated the defendant's convictions because the circuit court failed to provide a merger instruction to the jury. Id. at 306, 75 P.3d at 1197. As we would later explain, both offenses arose out of the same elemental conduct, "i.e., what the defendant did with the object, namely, 'possess[ed] it.'" State v. Frisbee, 114 Hawaiʻi 76, 83, 156 P.3d 1182, 1189 (2007) (alteration in original) (quoting Matias, 102 Hawaiʻi at 303, 306, 75 P.3d at 1194, 1197).

Accordingly, in vacating the felon in possession and place to keep convictions and remanding for a new trial for failure to instruct the jury on merger, the Matias court concluded that these statutes did not preclude the charging of these offenses as continuous offenses. Implicit in the court's holding was the conclusion that the statutes are comprised of elements--namely, the element of possession--that may extend beyond isolated moments.

The ICA subsequently followed our holding in Matias in State v. Padilla. As in Matias, the defendant in Padilla was convicted of felon in possession and place to keep, and the convictions were vacated because the circuit court failed to provide a merger instruction to the jury. Padilla, 114 Hawaiʻi 507, 508, 518, 164 P.3d 765, 766, 776 (App. 2007).

Here, Lavoie was also convicted for violating the felon in possession (HRS § 134-7(b)) and place to keep (HRS § 134-23(2)) statutes, neither of which excludes charging the offense as continuous. HRS § 134-7(b) prohibits a person convicted of a felony from "own[ing], possess[ing], or control[ling] any firearm." HRS § 134-23(a) provides that "all firearms shall be confined to the possessor's place of business, residence, or sojourn." Unlike the statute at issue in Arceo, the Hawaiʻi legislature has not set forth language in either statute that defines specific periods of conduct as separate

offenses.  Additionally, the elements of each offense involve possession, which can continue longer than a single point in time.  Martin, 62 Haw. at 371, 616 P.2d at 198 ("[E]xercise of control over [] property . . . involve[s] conduct that can extend beyond isolated moments.").

Thus, the offenses of felon in possession and place to keep may be charged as continuous offenses, and the jury was required to determine whether there was "one intention, one general impulse, and one plan," and whether the two offenses merged.  Matias, 102 Hawaiʻi at 305, 75 P.3d at 1196; Hoey, 77 Hawaiʻi at 38, 881 P.2d at 525.

We have previously recognized that the jury is tasked with making the factual determination of whether two offenses merged.  In Matias, the defendant was arrested after a police officer found Matias in his friend's car with a loaded handgun under his seat.  102 Hawaiʻi at 303, 75 P.3d at 1194.  We held that the defendant was entitled to a merger instruction because it was clear that the basis for the jury's guilty verdicts on both counts "arose out of the same factual circumstances."  Id. at 306, 75 P.3d at 1197.  We stated that

> it is common-sensical that a defendant charged in
> connection with the same incident with the offenses of
> place to keep . . . and [felon in possession] . . . would,
> in virtually every instance, be entitled to a merger
> instruction, pursuant to HRS [§] 701-109(1)(e), because
> both offenses would intrinsically arise out of the same
> conduct and attendant circumstances.

60

Matias, 102 Hawai'i at 306 n.10, 75 P.3d at 1197 n.10.

Similarly, in Padilla, the defendant was arrested for firing a gun from his car and a subsequent search of his truck revealed a loaded pistol in the truck bed. 114 Hawai'i at 511, 164 P.3d at 769. Relying on Matias, the ICA found that the circuit court committed plain error in failing to give a merger instruction because "[a]ll factual issues involved in [] determin[ing] [whether there was one intention, one general impulse, and one plan] must be decided by the trier of fact." Id. at 517, 164 P.3d at 775 (emphasis omitted) (citing Matias, 102 Hawai'i at 305, 75 P.3d at 1196).

Here, both the felon in possession and place to keep offenses were charged as having occurred on the same date, and the court's instructions on the elements of these offenses specified that date. Whether Lavoie's conduct constituted "separate and distinct culpable acts or an uninterrupted continuous course of conduct" was a question of fact that was required to be determined by the jury. Matias, 102 Hawai'i at 306, 75 P.3d at 1197 (internal citations omitted). And, the jury should also have been required to determine whether Lavoie had one intention, one general impulse, and one plan to commit both offenses. The circuit court's failure to instruct the jury to make these determinations was prejudicial and plainly

61

erroneous.  See Matias, 102 Hawai'i at 306, 75 P.3d at 1197;

Padilla, 114 Hawai'i at 517, 164 P.3d at 775.

The ICA, in affirming the circuit court, determined

that the two offenses arose from separate and distinct factual

circumstances: it found that the felon in possession offense was

completed before Lavoie left his home on the day of the

shooting, while the place to keep offense was separately

committed when Lavoie placed the firearm in his car.  Thus, the

ICA held that no merger instruction was required.  This holding

is incorrect for two reasons.  First, the ICA, in reaffirming

its own unpublished decision in State v. Stangel, held that a

place to keep offense cannot be a continuous offense because it

"is not defined by statute as a continuing course of conduct."

(Citing No. CAAP-13-0003941, 2015 WL 836928, at *9 (Haw. App.

Feb. 26, 2015).)  As discussed, this analysis is incorrect under

our law and also contrary to Matias and Padilla, which

determined that these crimes may be punished as continuing

offenses.[43]

Second, the ICA erred in affirming the circuit court's

improper fact finding.  In this case, the jury was responsible

for determining whether the place to keep and felon in

possession offenses were factually separate and distinct and

---

[43]    To the extent that Stangel holds that a place to keep offense
cannot be a continuous offense, it is overruled.

whether "there [was] but one intention, one general impulse, and one plan," not the court.  The circuit court found that the felon in possession offense "had been committed before the defendant had ever left his home" while the place to keep offense "occur[red] with the firearm being loaded and then transporting it in a place other than his place of business, residence, or sojourn."  Trial courts are not tasked with making factual findings regarding when each offense occurred or whether the defendant's conduct constitutes "an uninterrupted continuous course of conduct"; the jury must make such determinations. Matias, 102 Hawai'i at 306, 75 P.3d at 1197.

The circuit court has the duty and ultimate responsibility to instruct the jury on the proper and relevant law.  State v. Adviento, 132 Hawai'i 123, 137, 319 P.3d 1131, 1145 (2014).  The circuit court failed to do so in this case by omitting a merger instruction.  Failure by the circuit court to submit a merger instruction constituted plain error and was not harmless beyond a reasonable doubt.[44]  Frisbee, 114 Hawai'i at 84, 156 P.3d at 1190; Matias, 102 Hawai'i at 306, 75 P.3d at 1197.

_____

[44]    Additionally, as discussed supra note 10, Lavoie requested that the State be precluded from calling Victoria Toledo as a witness because the prosecutor had disclosed that Toledo had previously told him (the prosecutor) that an alleged encounter she had with Lavoie occurred several days prior to the shooting and not on the day of the shooting as she testified.  Instead, the prosecutor was permitted as "as an officer of the court" to make the following unsworn statement to the jury: "[O]n July 18, 2014, in a telephone conversation with [] Victoria Toledo, I recall her saying that Marlin Lavoie

(continued . . .)

## V. CONCLUSION

Accordingly, the ICA's June 6, 2018 Judgment on Appeal and the circuit court's August 13, 2015 Judgment, Conviction and Sentence are vacated, and this case is remanded to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Matthew S. Kohm<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Emlyn H. Higa<br>(Renee I. Delizo with him<br>on the briefs)<br>for respondent | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |





(. . . continued)

told her, 'If I can't have Malia, nobody else will,' and that the conversation took place a few days before the shooting."

However, the prosecutor proceeded to rely on Toledo's testimony--including her statement that the encounter occurred the same day as the shooting--during the trial. On redirect examination of Dr. Cunningham, for example, the prosecutor asked what his opinion would be "if the defendant . . . had previously told someone at about noon that same day that if I can't have her, nobody will."

We note that the manner in which the prosecutor corrected the record in this case--an unsworn statement made to the jury in open court--is problematic. For instance, the jury in a criminal trial is specifically instructed that statements and remarks by counsel are not evidence. See State v. Valdivia, 95 Hawai'i 465, 480, 24 P.3d 661, 676 (2001). Lavoie has not raised the flawed nature of this procedure on appeal, and it is not necessary for this court to resolve whether it warrants plain error review in light of our disposition of this case. Nevertheless, this matter is brought to the attention of the court and counsel so that the procedure used at the trial is not repeated.