**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000581
31-AUG-2020
08:00 AM**

NO. CAAP-17-0000581

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
ALLAN MICHAEL G. FELICIANO,
aka ALLAN M. GAMON FELICIANO,
Defendant-Appellant

APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT
(CASE NO. 3FFC-17-0000029)


MEMORANDUM OPINION
(By: Hiraoka and Wadsworth, JJ., and
Leonard, Presiding Judge, dissenting)

Defendant-Appellant Allan Michael G. Feliciano, also
known as Allan M. Gamon Feliciano (**Feliciano**), appeals from the
Judgment of Conviction and Probation Sentence (**Judgment**), entered
on June 2, 2017, in the Family Court of the Third Circuit (**Family
Court**).[1/]  After a jury trial, Feliciano was convicted of Abuse
of Family or Household Member, in violation of Hawaii Revised
Statutes (**HRS**) § 709-906(1) (Supp. 2016).[2/]

---

[1/]    The Honorable Ronald Ibarra presided.

[2/]    HRS § 706-906(1) provides, in relevant part:

It shall be unlawful for any person, singly or in concert,
to physically abuse a family or household member . . . .

For the purposes of this section:

. . . .

"Family or household member":

(continued...)

On appeal, Feliciano contends that the Family Court erred in allowing the State to adduce at trial evidence of a prior bad act that Feliciano allegedly committed in February 2016, when he allegedly pushed the complaining witness (**CW**), his then-wife, out of a chair.

After reviewing the record on appeal and the relevant legal authorities, and giving due consideration to the issues raised and the arguments advanced by the parties, we affirm the Judgment for the reasons set forth below.

## I.   RELEVANT BACKGROUND

On February 2, 2017, Feliciano was charged by complaint with "intentionally, knowingly or recklessly physically abus[ing the CW], a family or household member," in violation of HRS § 709-906(1).  The charge stemmed from an incident in the early morning hours of January 14, 2017 in which Feliciano allegedly struck the CW in the face.[3]  In his disclosure of defenses filed on March 7, 2017, Feliciano asserted that at trial, he "may rely on [several] defenses," including that he "lacked the specific state of mind required to commit the offense charged," and that he acted in "[s]elf defense[.]"

On April 21, 2017, the State filed a notice of intent to use evidence of Feliciano's "prior bad acts" at trial – namely, "[f]acts and [c]ircumstances documented in police report C17001634 and in interviews with [the CW] detailing an incident in 2016 in which [Feliciano] pushed [the CW] out of a chair" (**the chair incident**).  In response to Feliciano's subsequent motion in limine to exclude the evidence, the State asserted, among other

---

[2] (...continued)

> (a)   Means spouses or reciprocal beneficiaries, former spouses or reciprocal beneficiaries, persons in a dating relationship as defined under section 586-1, persons who have a child in common, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit[.]

[3]   The incident followed a party at the home of Feliciano and the CW on the evening of January 13, 2017.  Hence, the complaint alleged that Feliciano committed the charged offense "[o]n or about the 13th day of January, 2017[.]

things, that: (a) the chair incident contributed to the CW's medical use of marijuana; (b) Feliciano, through counsel, had indicated an intention to raise at trial the issue of the CW's use of marijuana on the night of January 13, 2017; (c) the State intended to elicit testimony of the chair incident as necessary to explain the CW's medical use of marijuana; and (d) the chair incident was also relevant to rebut Feliciano's expected defenses of ignorance or mistake and self-defense, as noted in Feliciano's disclosure of defenses and proposed special jury instructions.

Prior to the start of trial on June 1, 2017, the Circuit Court denied Feliciano's motion to exclude evidence of the chair incident,[4] in the following exchange:

> [Deputy Prosecuting Attorney (**DPA**)]: -- far as the prior bad acts, the State is just trying to reserve its ability to bring up a prior incident between the defendant and the [CW] with regard --
>
> THE COURT: You did provide notice --
>
> [DPA]: Yes.
>
> THE COURT: -- so yes.
>
> So you talking about prior actions of the defendant may be relevant?
>
> [DPA]: If that --
>
> THE COURT: If the --
>
> [DPA]: -- her marijuana usage is brought up.
>
> THE COURT: If the door is opened.
>
> [DPA]: Yes.
>
> THE COURT: So well to that extent, if the motion in limine is prohibiting that, motion is denied.

At trial, during Feliciano's opening statement, defense counsel portrayed the CW as "under the influence of various substances" on the night of January 13, 2017, and claimed that Feliciano's "actions were justified." Specifically, defense counsel stated:

> The evidence will show that nothing that [the CW] did on that night made sense. She was under the influence of various substances. She was behaving aggressively. At the end of the night she was in bed with another man in the home that she and her husband purchased together.

---

[4] A written order denying Feliciano's motion in limine was entered on June 13, 2017.

. . . Feliciano is not guilty of abuse of family or household member. He was the one who was acting reasonably that night. His actions were justified and they were permitted under the law.[5]

Moments later, defense counsel described the couple's "rocky" relationship:

He loved his wife. He loved his job. They owned a home. He's proudly serving his country. Things started to get rocky and within the last couple years they got more and more rocky. There were nights that [CW] was not coming home.

Defense counsel then returned to the night of the incident, stating in part:

Now, again, nothing that [the CW] did on that night made sense. . . .

Now [Feliciano] goes to bed and there are couple of people still hanging out. Around 2:00 in the early morning he wakes up. He notices that [the CW] is not with him. . . .

He walks out into the living room. In the living room is a couch that folds out into a bed. The couch is folded out into the bed. And under the blankets on that couch he sees his wife and his friend. They're asleep.

. . . So he wakes her up and what he does is reasonable. He asks her to come to bed. . . .

And for a little bit, [the CW] agrees. She's groggy. Intoxicated. . . .

And then they get into an argument and she pushes him. She lunges at him. And she says, "Take your drunken friend to bed. Take your friend to bed." Again, nothing is making sense and he reacts and he slaps her, and he reacts reasonably. . . .

Following opening statements, the State called the CW as its first witness. The CW testified that on the evening of January 13, 2017, she and Feliciano had a get together with friends at their home. The CW did not have anything to drink that night, but she did use marijuana. She explained that she had a medical marijuana license — that she suffered from chronic back pain and used marijuana for pain management. She confirmed that at the gathering that night, Feliciano was drinking alcohol "the whole time."

---

[5] Similarly, in her closing statement, defense counsel argued that the CW acted under "intoxication by marijuana," and that Feliciano "ha[d] no obligation under the law to stand there and take it."

The CW further testified that when "some roughhousing" broke out between two of the guests, Feliciano became involved in the argument, and the CW tried to calm him down to keep him from fighting. As the CW talked to Feliciano, he grabbed and twisted her wrist. The CW then went into the house, shut off the lights, pulled out the bed from the couch, and fell asleep on the couch bed with her clothes on. In the early morning, she was pulled out of the bed by Feliciano, and she saw that one of his friends was also sleeping on the couch bed with his clothes on. The CW told Feliciano that "[she] didn't wanna go and sleep in the room with him, in the same bed, and [she] told him to take his friend with him 'cause [she] was sleeping on the couch first." After that, Feliciano, who was "under the influence of alcohol," "got mad at [her.] And . . . he said, 'Oh, why you don't wanna come sleep in the room with me, 'cause I hurt you? You don't know what hurting is. You don't know what abuse is. I'll show you.'" Then, according to the CW, Feliciano struck her on the left side of her face with his right fist. She said that both of her hands were "at her side" when Feliciano struck her, and that she "blacked out and . . . fell on the ground" after being hit.

On cross-examination, defense counsel initially asked the CW about her marijuana use, her medical marijuana card, and other prescribed medications she was taking. Defense counsel also asked the CW about the couple's separation for several months prior to the night that Feliciano struck her:

> Q.    . . . .
>
> And at this time around January you were not actually staying at that Mamalahoa home frequently, were you?
>
> A.    I had just moved back, yeah.
>
> Q.    Okay.
>
> How long had you been gone before?
>
> A.    About six months.
>
> Q.    And you were –
>
> A.    I was separated.
>
> Q.    -- staying at your parents' house before then –
>
> A.    Yeah.

5

Defense counsel did not ask why the couple had separated.

During his own testimony, Feliciano disputed the CW's account of events on the night at issue. He testified that after a get together with friends at the couple's home, he fell asleep in the master bedroom and woke up to find that the CW was not in bed. He went to look for her and found her sleeping in the living room on the pull-out couch bed "under the covers with one of [his] friends." Feliciano stated that he woke up the CW and pulled her up to go back to the bedroom; as they were walking, she pulled her hand away, became angry, and kept pushing him until he reacted by slapping her face.

Feliciano further testified:

> Q. (By [defense counsel]) . . . [Y]ou're aware that at this time [the CW] is on a number of medications; is that right?
>
> A. Yes.
>
> Q. Including marijuana?
>
> A. Yes.
>
> Q. Okay. Were you on any sort of medication?
>
> A. No. I didn't need any of that stuff to try and get anything out.

On direct examination, Feliciano also testified about his marital relationship with the CW, including the roughly six-month period before January 2017 when the couple separated and the CW was living at her parents' home. Feliciano stated that the relationship began to deteriorate after the CW "started going heavy on marijuana usage" and that the CW eventually "moved out on her own." He testified, in relevant part, as follows:

> Q. Okay, and then if you can briefly just describe to us your marriage to [the CW].
>
> A. At the beginning it was great. You know, we were newlyweds. We did everything together. We compromised. Just this past few years she started going heavy on marijuana usage and she stopped going to work. I would come home from work and I would just catch her watching TV, smoking all day. I would have to clean up after the animals and cook dinner at night after working all day.
>
> . . . .
>
> Q. (By [DEFENSE COUNSEL]) So you mentioned that you would get home after working and [the CW] would be home?
>
> A. Yes, she would be home.

6

Q. Okay, and this is in the context of things were a little bit rocky in your relationship earlier this year; is that fair to say?

A. Yes. She wouldn't -- like during --

Q. . . . You mentioned that she would smoke marijuana. Where would she get her marijuana from?

A. She would make deals with her friends. She would buy from her friends.

Q. Okay, and then after things started going downhill, did you guys ever talk about separating?

A. She wanted to separate but I didn't want to separate. I felt like we could try and work something out.

Q. So had you talked to her about working things out?

A. I have but she wanted to separate because --

Q. So at some point did you separate?

A. Yes, we did.

Q. Okay, and what did that involve?

A. Before January we were separated for about six months. She was living at her parents' house and I was up at the house. I didn't want to separate. She moved out on her own. She would come home once in a while but during that time frame she got into a lot of trouble. She crashed --

[DPA]: Objection.

THE COURT: Sustained.

Later in his testimony, Feliciano further discussed the couple's separation as follows:

Q. So you had just previously testified that [the CW] had not been living there but was she there on that night?

A. She was.

Q. And can you tell us, what was she doing at the party?

A. She was there. We were -- she was actually staying there for about a week and a half now. We were trying to work things out.

On cross-examination, the State asked Feliciano about finding the CW on the couch with his friend:

Q. And when you saw them, you got upset; correct?

A. Yes, yes, I did.

Q. And part of the reason you got upset is because you had been cheated on before?

A. Correct.[6]

Q. So you thought [the CW] was sleeping with your friend in a more than just laying next to each other?

A. It looked like it, yes.

Q. In your own house; correct?

A. Correct.

Q. And you were angry?

A. Well, I was more worried. I was sad.

Q. And you were so angry, you pulled her out of the bed?

A. That's incorrect.

Q. You didn't pull her out of the bed?

A. I didn't pull her out of the bed in an angrily [sic] manner.

Q. Why pull her up at all?

A. So she could come to bed with me.

Q. Shouldn't she make that decision herself?

A. To sleep with another man?

Q. Can you force -- do you think you should be able to force your wife to come to bed with you?

. . . .

A. Yes, it was her choice to stay I guess.

(Footnote added.)

Shortly after this testimony, the State followed up with Feliciano about the couple's prior separation, and he testified as follows:

Q. Now, you mentioned that [the CW] wanted to separate and she had moved out earlier?

A. Yes.

Q. Why did she move out?

A. She had her -- to be honest, I don't really know why, the real reason why she wanted to separate.

Q. Did she move out because of something you had done to her?

A. Not that I recall.

Q. Did she move out because of something you had done to

_____

[6] Feliciano testified that the person who had previously cheated on him was not the CW.

8

her in February of last year?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled. Opened the door.

A. I don't– I don't remember doing anything to her in February.

Q. (By [the DPA]) Did you push her out of a chair in February because you were upset about something to eat?

A. No, I didn't.

After the defense rested and the jury left the courtroom, the State said it would call the CW as a rebuttal witness. The following exchange then occurred:

[DEFENSE COUNSEL]: So if the State does not get into these prior bad acts that were brought out, then we won't need a surrebuttal. The prosecutor asked --

THE COURT: Well, this is a different issue, whether the State did elicit proper foundation to address what the court over your objection ruled or overruled your objection, being the door was opened as far as he doesn't have a drinking problem, he -- and the other incident for which she said that a reason for her moving out is that --

[DPA]: The only thing I'm going to --

THE COURT: What's the rebuttal then?

[DPA]: It's the self-defense, whether or not she was pushing him, and the chair incident.

[DEFENSE COUNSEL]: That's the concern, the chair incident. This is an entire other incident. He should have an opportunity to explain.

[DPA]: He just did.

THE COURT: He was given the opportunity to deny it. That's the reason -- because he raised it himself that she moved out and he asked the question why is she moving out.

[DEFENSE COUNSEL]: Okay, but depending on her testimony, what she says, this new information, which we might not be aware of, that's the concern.

THE COURT: So the only incident for which the prosecutor is going to seek rebuttal is why she moved out and it is because of the chair because you raised that and he denied it, not any other reasons.[7/]

---

[7/]    As the dissent points out, the prosecutor then stated: "I'm not going to ask her about why she moved out at all. I'm going to ask her about the chair incident." The court responded: "But that's the reason why you pointed the question to him as a reason for her moving out." The prosecutor then said, "Right, and he denied it. . . . If I asked her why she moved out, there may be other things[,]" and the court responded, "Maybe you can point -- I'll ask you a leading question, did you move out because of that incident, and she can say yes or no." That is essentially how the State asked the

(continued...)

Following a brief recess, the proceedings continued without the jury. The Circuit Court stated, in relevant part:

> THE COURT: . . . [S]o I'm going to read the instruction before she testifies. You are about to hear evidence that the defendant at another time may have committed other wrongs. This is the allegation, pushing out of a chair, right? This evidence, if believed by you, may be considered only on the issue of the relationship of the parties, and do not consider this evidence for any other reason. You must not use this evidence to conclude that because defendant at another time may have engaged in other wrongs that he is a person of bad character and, therefore, must have committed the offense charged in this case.
>
> [DEFENSE COUNSEL]: No objection.
>
> [DPA]: No objection.
>
> THE COURT: And this will be given prior to her testimony and that's the only time that the court will give this instruction.

After the jury returned to the courtroom, a bench conference was held:

> THE COURT: This is a bench conference on the record.
>
> The reason the court is giving this instruction and to allow the rebuttal question is because defendant testified on the relationship between the parties by saying she used drugs or marijuana and that-- well, the relationship was raised and the inference was also left that she moved out for different reasons. That was the inference. And the court has also looked at the 403 balancing factor, prejudicial versus probative, and finds this is more probative than prejudicial.

After the conclusion of the bench conference, the Circuit Court instructed the jury as follows:

> THE COURT: Back on the record. . . .
>
> So, Ladies and Gentlemen, you are about to hear evidence that the defendant at another time may have committed other wrongs. This evidence, if believed by you, may be considered only on the issue of the relationship of the parties. You must not -- do not consider this evidence for any other reason. You must not use this evidence to conclude that because the defendant at another time may have committed other wrongs that he is a person of bad character and, therefore, must have committed the offense charged in this case.

---

7/(...continued)

question in rebuttal. See infra. Thus, it appears that in stating, "I'm not going to ask her about why she moved out at all," the prosecutor was merely declining to ask an open-ended question that conceivably could have invited other prejudicial testimony regarding Feliciano. Instead, at the court's suggestion, the State elicited narrower testimony regarding the chair incident, which was the minimum necessary to obtain its probative value. See infra.

10

The CW was called as a rebuttal witness and testified, in relevant part, as follows:

> Q.  In -- when you moved out in 2016, did you move out because he pushed you out of a chair in February of 2016?
>
> A.  Yes, yes.

## II.  DISCUSSION

Feliciano contends that the Circuit Court abused its discretion when it allowed the State:  (1) to cross-examine him about the chair incident; and (2) to call the CW to rebut Feliciano's testimony denying the chair incident.  The State argues, and the Family Court ruled, that Feliciano "opened the door" to this evidence by testifying on direct examination that the CW's marijuana usage had led to the deterioration of the couple's relationship and their temporary separation.  The State further argues that the same evidence, when analyzed independently under Hawaii Rules of Evidence (**HRE**) Rule 404(b),[8] was:  (1) relevant, and (2) more probative than prejudicial.

We address each of these contentions, in turn, below.

### A.  Opening-the-Door Doctrine

"The 'opening the door' doctrine is essentially a rule of expanded relevancy . . . ."  State v. Lavoie, 145 Hawaiʻi 409, 422, 453 P.3d 229, 242 (2019) (quoting State v. James, 677 A.2d 734, 742 (N.J. 1996)).  "Under this doctrine, when one party introduces inadmissible evidence, the opposing party may respond by introducing inadmissible evidence on the same issue."  Id. (emphasis added; brackets omitted) (quoting State v. Fukusaku, 85 Hawaiʻi 462, 497, 946 P.2d 32, 67 (1997)).  However, the opening-the-door doctrine "generally does not allow a party to admit evidence that is otherwise inadmissible to rebut an opponent's

---

[8]    HRE Rule 404(b) provides, in part:

> **Other crimes, wrongs, or acts.**  Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

11

relevant and admissible evidence."  Id. at 423, 453 P.3d at 243 (emphasis added) (citing Clark v. State, 629 A.2d 1239, 1244 (Md. 1993)).

Here, Feliciano argues that his testimony about the CW's marijuana use and its effect on the couple's relationship was only "slightly relevant" to either side's theory of the case. The State, on the other hand, contends that "the entire defense was to portray the [the CW] as an unfaithful and intoxicated person of bad character[.]"  The State further contends that "[d]efense counsel's presentation at trial suggested the evidence of [the CW's] use of marijuana was very relevant[,]" and that Feliciano adduced the evidence to undermine the CW's character and credibility.  Neither party contends — nor did the Family Court rule — that Feliciano's testimony was irrelevant or otherwise inadmissible.  Further, we conclude that Feliciano's testimony was relevant to the couple's relationship, including the reason for their prior separation, as further discussed below.  Accordingly, because Feliciano's testimony regarding the CW's marijuana use was admissible, the State's cross-examination of Feliciano and the CW's rebuttal testimony regarding the chair incident, if otherwise inadmissible, would not generally be admissible under the "opening the door" doctrine.

In Lavoie, however, the supreme court recognized "authority from other jurisdictions for the proposition that the door may also be opened to inadmissible evidence when a party offers admissible evidence that is false or misleading if considered in isolation."  145 Hawaiʻi at 424, 453 P.3d at 244; see id. at 424 n.30, 453 P.3d at 244 n.30 (citing Valadez v. Watkins Motor Lines, Inc., 758 F.3d 975, 981 (8th Cir. 2014) (holding that a party may open the door to inadmissible evidence to the extent that the inadmissible evidence "clears up a false impression" or "clarifyies or completes an issue opened up by opposing counsel") (brackets omitted); United States v. Osazuwa, 564 F.3d 1169, 1175 (9th Cir. 2009) (same); United States v. Brown, 921 F.2d 1304, 1307 (D.C. Cir. 1990) (same); State v. Carlson, 767 A.2d 421, 425 (N.H. 2001) (same)).  The court concluded that "such a rule would not apply here even if this

court were to adopt it because no aspect of [the witness's] testimony was shown to be false or misleading."[9] Lavoie, 145 Hawaiʻi at 424, 453 P.3d at 244.

Here, in contrast, Feliciano presented evidence and argument, as part of his theory of the case, to portray the CW as an unfaithful, drug-abusing spouse who was responsible for the couple's prior separation, as well as for Feliciano's conduct on the night he struck her. In this context, Feliciano's testimony created at least the strong impression that the CW's marijuana usage had led to the deterioration of the couple's relationship and their temporary separation. On cross-examination, before any objection by defense counsel, he denied that the CW had moved out "because of something [he] had done to her." Under these circumstances, the State's further cross-examination of Feliciano about the chair incident challenged his account of the reason for the couple's separation. Similarly, the CW's rebuttal testimony directly rebutted Feliciano's account by linking the couple's separation to the chair incident. This evidence, in turn, shed light on the purportedly true nature of the couple's relationship. The State thus offered direct evidence which, if believed, would show that Feliciano's testimony regarding the couple's relationship and separation was false or misleading. Cf. Lavoie, 145 Hawaiʻi at 424, 453 P.3d at 244 (no indication that a witness's testimony was likely to convey a false impression where it was never shown that instances of abuse had any relation to the couple's separation).

_____

[9]    The supreme court also stated that it "may have implicitly rejected the rule [that a party may open the door to inadmissible evidence that clears up a false or misleading impression] in Fukusaku[.]" Lavoie, 145 Hawaiʻi at 424, 453 P.3d at 244. We do not read Fukusaku as having reached this result. There, the court concluded that general testimony elicited from an expert on cross-examination by defense counsel about the absence of blood on the cushions in the defendant's apartment did not open the door to testimony about inadmissible test results indicating the presence of blood in some areas of the apartment. See 85 Hawaiʻi at 497, 946 P.2d at 67. The latter results came from tests that were subject to false positive reactions, and confirmatory tests had not been conducted to conclusively establish the presence of human blood. The trial court thus ruled that the test results were not relevant, and that, even if relevant, they were more prejudicial than probative. Id. at 496-97, 946 P.2d at 66-67. Fukusaku therefore did not present a situation where a party was shown to have offered evidence creating a false or misleading impression.

13

Although Feliciano now contends that the couple's relationship and separation were only "slightly relevant," at trial, he attributed the couple's "rocky" relationship to the CW's marijuana use.  Indeed, defense counsel later tied the CW's marijuana use to Feliciano's self-defense justification, arguing to the jury that "intoxication by marijuana" was "not a defense to [the CW's] actions" on the night of the alleged offense, and Feliciano "ha[d] no obligation under the law to stand there and take it."

"When a defendant leaves the trier of fact with a false or misleading impression, the State is entitled to counter with evidence to refute the impression created by the defendant and cure the misleading advantage."  Carlson, 767 A.2d at 425 (quoting State v. MacRae, 677 A.2d 698, 704 (N.H. 1996)).  We conclude that under these circumstances, where Feliciano offered evidence that could be shown to be false or misleading in isolation, the State's cross-examination of Feliciano and the CW's rebuttal testimony regarding the chair incident were admissible to place Feliciano's testimony in its proper context and to correct the allegedly false impression created by that testimony.  See Clay v. State, 102 S.W.3d 794, 797 (Tex. App. 2003) ("Where the defendant delves into part of a subject, the [prosecution] is entitled to inquire into the whole of the matter in order to explain it or correct a false impression, even if the later evidence might otherwise be inadmissible.").  The Family Court therefore properly admitted the evidence for that purpose.

**B.    Probative Value and the Danger of Unfair Prejudice**

We further conclude that, even apart from the opening-the-door doctrine, the State's introduction of the prior-bad-act evidence independently passes muster under HRE Rule 404(b).  Under that rule, "any purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character."  State v. Acker, 133 Hawaiʻi 253, 277, 327 P.3d 931, 955 (2014) (quoting State v. Yamada, 116 Hawaiʻi 422, 435, 173 P.3d 569, 582 (App. 2007)).

Here, the State's cross-examination of Feliciano was offered for at least one proper purpose, namely, to show the full

14

context of the couple's relationship and, relatedly, to test Feliciano's credibility as a witness after he testified that the CW's marijuana use led to the couple's separation. See State v. Locken, 134 Hawaiʻi 376, 381, 341 P.3d 1176, 1181 (App. 2014). Similarly, the CW's rebuttal testimony contradicted Feliciano's denial that the CW had moved out because of the chair incident, thereby impeaching Feliciano's credibility. See id. At the same time, the cross-examination and rebuttal testimony served to rehabilitate the CW's character and credibility, which Feliciano had sought to undermine through his testimony. As such, the line of questioning and the rebuttal testimony were probative of issues of consequence in the case. See HRE Rule 404(b).

The full context of the couple's relationship also bore on Feliciano's self-defense justification. Feliciano was charged with intentionally, knowingly, or recklessly causing physical abuse of a family or household member in violation of HRS § 709-906(1).[10/] He claimed that he was justified in that he acted in self-defense, thereby putting in dispute his state of mind when he struck the CW. See Arakawa, 101 Hawaiʻi at 32-33, 61 P.3d at 543-44. In particular, the context of the couple's relationship, including Feliciano's alleged prior abuse of the CW, was probative of whether he reasonably believed that striking the CW was immediately necessary for the purpose of protecting himself against the CW's alleged use of unlawful force against him.[11/]

---

[10/] Because HRS § 709-906 does not specify the state of mind required, HRS § 702-204 (2014) provides the default. See State v. Arakawa, 101 Hawaiʻi 26, 32, 61 P.3d 537, 543 (App. 2002). Section 702-204 provides, in relevant part: "When the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly."

[11/] While the Hawaiʻi appellate courts have not directly addressed the interplay between a defendant's self-defense claim and his or her prior acts of domestic abuse against the same victim, a number of courts in other jurisdictions have concluded that such acts can be admissible in some circumstances to rebut a defendant's self-defense claim, "usually by proving that the defendant could not reasonably have feared the victim or that he or she acted inconsistently with a reactionary defensive outburst." See State v. Richards, 879 N.W.2d 140, 148 (Iowa 2016) (citing several cases). In Richards, for example, the Iowa Supreme Court held that evidence of the defendant's prior acts of domestic violence against the victim was probative of whether the defendant acted, as he claimed, in furtherance of a belief that he needed to protect himself against imminent injury at the victim's hands. 879 N.W. 2d at 152. Similarly, in State v. Dukette, 761 A.2d 442, 446-47 (N.H. 2000), the New Hampshire Supreme Court ruled that "evidence that the
(continued...)

See HRS § 703-304; State v. Augustin, 101 Hawaiʻi 127, 128, 63 P.3d 1097, 1098 (2002) ("With respect to the use-of-force defenses, the defendant's belief must be 'reasonable[.]'" (citing HRS § 703-300 (1993) ("'Believes' means reasonably believes."))).

The record shows that the Family Court also weighed the probative value of the alleged prior abuse against the danger of unfair prejudice. See HRE Rule 403.[12/] The Family Court's balancing under HRE Rule 403 is reviewed for an abuse of discretion. State v. Richie, 88 Hawaiʻi 19, 37, 960 P.2d 1227, 1245 (1998). Here, based on our review of the record, we cannot conclude that the Family Court abused its discretion in determining that the evidence was more probative than prejudicial and thus admitting the evidence.

When weighing probative value versus prejudicial effect, a court must consider a variety of factors, including:

> the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

State v. Renon, 73 Haw. 23, 38, 828 P.2d 1266, 1273 (1992) (quoting State v. Castro, 64 Haw. 633, 644, 756 P.2d 1033, 1041 (1988)).

First, the evidence of the chair incident was clear and direct, as it was based on the testimony of the victim, the CW. See Richards, 879 N.W.2d at 152 ("[a] victim's testimony, standing alone, satisfies the requirement of clear proof" (quoting State v. Jones, 464 N.W.2d 241, 243 (Iowa 1990))). Feliciano disputes the CW's credibility, as she admitted on cross-examination that she moved out several months after the

---

[11/](...continued)

defendant previously committed unprovoked assaults upon the alleged victim to which the alleged victim did not respond violently undermine[d] the defendant's argument that she reasonably believed the alleged victim was about to use unlawful . . . force against her."

[12/]    HRE Rule 403 provides for the exclusion of relevant evidence where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

chair incident.  However, the CW's testimony was sufficient to support the probative value of the evidence, and it was for the jury to determine the CW's credibility.

Second, there were similarities between the chair incident and the present offense, both of which were acts of domestic violence directed toward the same victim.  Indeed, Feliciano concedes that the similarities between the two incidents "probably weigh[] in favor of the State."  While the incidents were not identical, we conclude that the similarities weighed in favor of admitting the chair-incident evidence.

Third, the interval of time that elapsed between the chair incident and the present offense – less than a year – did not diminish the probative value of the context of the relationship.  See, e.g., Richards, 879 N.W.2d at 144, 153 (affirming admission of evidence of other abusive acts that allegedly occurred "within the previous year"); Dukette, 761 A.2d at 446 (the other acts "were not so removed in time as to render them irrelevant" because they occurred within three years of the charged conduct (citing State v. Allen, 514 A.2d 1263, 1268 (N.H. 1986))).  Here, again, Feliciano admits that this factor "probably weighs in favor of the State[,]" and we reach the same conclusion.

Fourth, the need for the evidence was substantial.  The trial was largely a credibility contest between Feliciano and the CW, and Feliciano sought to undermine the CW's character and credibility by portraying her as an unfaithful, drug-abusing spouse who was responsible for the couple's prior separation.  Under these circumstances, the State's cross-examination of Feliciano and the CW's rebuttal testimony regarding the chair incident were admissible to impeach Feliciano's credibility, to rehabilitate the CW's credibility, and to provide the jury with a fuller picture of the couple's relationship.

In addition, the evidence regarding the chair incident helped to rebut Feliciano's self-defense justification.  During her opening statement, defense counsel asserted that on the night the CW was struck, "[s]he was under the influence of various substances[,]" and "was behaving aggressively."  Defense counsel

17

continued: "[Feliciano] was the one who was <u>acting reasonably</u> that night. His actions were <u>justified</u> and they were permitted under the law." (Emphasis added.) Similarly, in her closing, defense counsel argued that the CW acted under "intoxication by marijuana," and that Feliciano "ha[d] no obligation under the law to stand there and take it." In this context, evidence of the chair incident was probative of whether Feliciano, as he claimed, could have reasonably believed that striking the CW was immediately necessary for the purpose of protecting himself. See <u>supra</u>.

Fifth, given Feliciano's denial of the chair incident, the efficacy of alternative proof was low. In fact, it does not appear there was any alternative proof available.

Sixth, the degree to which the evidence would rouse the jury to overmastering hostility was low. The CW answered only a single "yes" or "no" question regarding the chair incident; she was not permitted to describe any resulting injury; and the chair incident as briefly described appeared to have been less violent than the present offense, and was thus unlikely to rouse the jury to overmastering hostility. See, e.g., <u>Richards</u>, 879 N.W.2d at 152 ("the district court carefully circumscribed the scope of the other acts testimony and thereby limited its potential prejudicial impact" (citing <u>State v. Rodriquez</u>, 636 N.W.2d 234, 243 (Iowa 2001))).

Indeed, the testimony regarding the chair incident was much narrower, and far less likely to engender ill will in the jury, than the prior-bad-act evidence considered in <u>State v. Gallagher</u>, 146 Hawaiʻi 462, 463 P.3d 1119 (2020). There, the supreme court ruled that the trial court abused its discretion in allowing the admission of four prior incidents that "involved aggressive, obscenity-laden, and angry misconduct by [the defendant] toward the [complaining witnesses,]" including testimony regarding "specific details of each incident in which [the defendant] had harassed the family[,]" as well as the escalating nature of the incidents, the terror they engendered, and the protective countermeasures they prompted. <u>Id.</u> at 470, 472, 463 P.3d at 1127, 1129. In analyzing the HRE Rule 404(b)

18

factors, the court deemed the four prior incidents, which did <u>not</u> involve property damage, only marginally probative of the defendant's awareness or knowledge of the extent of damage his actions would cause in the underlying offense, which involved property damage to a vehicle. <u>Id.</u> at 472, 463 P.3d at 1129. The court further found that the "extensive surrounding details of the incidents," – in particular, "the recounting of the [complaining witnesses'] ongoing fear of [the defendant]" – "had no bearing on this issue." <u>Id.</u> Rather than present these details, "the State could have elicited a much less elaborate recounting of the prior incidents, greatly limiting testimony to the aspects of the incidents that ostensibly bore on [the defendant's] state of mind." <u>Id.</u> at 473, 463 P.3d at 1130; <u>see also</u> <u>id.</u>, 463 P.3d at 1130 ("the number of prior incidents should have been limited to the minimum sufficient to obtain the asserted probative value the conduct offered"). Ultimately, the court concluded that "the number of prior incidents and the involved circumstances had a high potential to rouse the jury to overmastering hostility against [the defendant]." <u>Id.</u> at 474, 463 P.3d at 1131 (internal quotation marks omitted) (citing <u>State v. Behrendt</u>, 124 Hawaiʻi 90, 106, 237 P.3d 1156, 1172 (2010)).

Here, in contrast, just one prior bad act – the chair incident – was admitted into evidence, and that act, like the present offense, involved domestic violence directed at the CW. In addition, no prejudicial details (<u>e.g.</u>, resulting injury to, and fearful reactions by, the CW) were elicited. Rather, consistent with the court's admonition in <u>Gallagher</u>, the State elicited "a much less elaborate recounting of the prior incident[]," which bore on the context of Feliciano and the CW's relationship, and was probative of their respective credibility during trial. <u>See</u> <u>supra</u>. In short, here, the narrow testimony regarding the chair incident was higher in probative value, with a much lower potential for prejudicial effect, than the prior-bad-act evidence that was ruled inadmissible in <u>Gallagher</u>.

In addition, immediately before the CW's rebuttal testimony regarding the chair incident, the Family Court gave the jury a limiting instruction, which properly informed the jury

19

that the evidence, if believed, could be considered only on the issue of the parties' relationship, and must not be considered to determine that Feliciano was a person of bad character.  The jury is presumed to follow the trial court's instruction, and the limiting instruction served to mitigate any unfair prejudice resulting from the evidence of the chair incident.  See Locken, 134 Hawaiʻi at 381, 341 P.3d at 1181; see also Richards, 879 N.W.2d at 153 ("The district court followed 'the better practice' and gave the jury a limiting instruction curtailing the danger of unfair prejudice." (citing State v. Bayles, 551 N.W.2d 600, 608 (Iowa 1996))).

Feliciano argues that the limiting instruction was "nullified" by another limiting instruction that the Family Court provided in its final instructions to the jury before deliberation.  That instruction stated:

> THE COURT: . . . You have heard evidence that the defendant at another time may have engaged in other acts.  This evidence, if believed by you, may be considered only on the issue of defendant's motive to commit the offense charged.  Do not consider this evidence for any other reason.  You must not use this evidence to conclude that because the defendant at other times may have engaged in other acts that he is a person of bad character and, therefore, must have committed the offense charged in this case.  In considering the evidence for the limited purpose for which it has been received, you must weigh it in the same manner as you would all other evidence in this case and consider it along with all other evidence in this case.

Feliciano contends that this "'motive' instruction," when read in conjunction with the limiting instruction that was given before the CW's rebuttal testimony, was confusing and misleading.

We note that Feliciano did not object to this instruction during trial, and, on appeal, he does not assert any alleged deficiency in the instruction as a point of error.[13/]  He merely contends that it undermined the efficacy of the earlier limiting instruction.  We disagree.

Immediately prior to giving the "motive instruction," the Family Court provided the following instruction to the jury:

> Several times during the trial, I've told you that certain evidence was allowed in this trial for a particular

_____

[13/]     Indeed, Feliciano requested that the Family Court's jury instructions include Instruction 2.03, Other Crimes, Wrongs or Acts from the Hawaiʻi Pattern Jury Instructions - Criminal.

> and limited purpose.  When you consider that evidence, you
> must limit your consideration to that purpose.

This instruction evoked the court's earlier limiting instruction, given immediately before the CW's testimony regarding the chair incident, which instructed the jury that evidence of Feliciano's "other wrongs," if believed, could be considered only on the issue of the relationship of the parties and not to determine that Feliciano was a person of bad character.

In contrast, the subsequent "motive instruction" referred to evidence that Feliciano may have engaged in "other acts," which, if believed, could be considered only on the issue of Feliciano's motive to commit the offense charged.  We do not read this instruction as referring to the "other wrong," i.e., the chair incident, about which the CW testified.  There was also testimony regarding other acts of Feliciano (e.g., an alleged substance abuse problem) that may have been relevant to Feliciano's motive or intent to commit the offense.  The "motive instruction" did not nullify the prior limiting instruction that the Family Court gave to mitigate any unfair prejudice resulting from the evidence of the chair incident.

### III.  CONCLUSION

Accordingly, we conclude that the Family Court did not abuse its discretion in allowing the State (1) to cross-examine Feliciano about the chair incident, and (2) to call the CW to rebut Feliciano's testimony denying the chair incident.  We therefore affirm the Judgment of Conviction and Probation Sentence, entered on June 2, 2017, in the Family Court of the Third Circuit.

DATED:  Honolulu, Hawaiʻi, August 31, 2020.


On the briefs:

William H. Jameson, Jr.,
Deputy Public Defender
for Defendant-Appellant.

Linda L. Walton,
Deputy Prosecuting Attorney,
County of Hawaiʻi,
for Plaintiff-Appellee.

/s/ Keith K. Hiraoka
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge

DISSENTING OPINION BY LEONARD, J.

Respectfully, I dissent. As discussed in the Majority's disposition, Defendant-Appellant Allan Michael G. Feliciano (**Feliciano**) contends that the Family Court of the Third Circuit (**Family Court**) erred in allowing the State to adduce evidence of a prior bad act that he allegedly committed in February 2016 – eleven months prior to the alleged incident underlying the abuse charge against Feliciano – when he allegedly pushed his wife, the complaining witness (**CW**), out of a chair. Roughly four months after the alleged chair incident, CW temporarily moved out of the couple's home. After the Family Court ruled that it would allow the State to ask Feliciano whether CW moved out because he pushed CW out of a chair in the prior February, he denied it. The State was then allowed on rebuttal to ask CW whether she moved out because Feliciano pushed her out of a chair in February of 2016, and she said yes.

I.   The Opened-the-Door Rulings

In the first instance, the Family Court allowed the alleged-chair-incident evidence to be introduced because Feliciano "opened the door." The State made no argument just prior to the Family Court's ruling, but subsequently argued that it was calling CW in rebuttal for "the self-defense, whether or not she was pushing him, and the chair incident." When discussing the potential rebuttal testimony of CW, the court stated: "So the only incident for which the prosecutor is going to seek rebuttal is why she moved out and it is because of the

chair because you raised that and he denied it, not any other reasons." The prosecutor then clarified: "I'm not going to ask her why she moved out at all. I'm going to ask her about the chair incident." The Family Court later explained that the alleged-chair-incident evidence was made relevant "because the defendant testified on the relationship between the parties by saying she used drugs or marijuana and that -- well, the relationship was raised and that the inference also was left that she moved out for different reasons." The Family Court further stated that it had "also looked at the [Hawaiʻi Rules of Evidence (**HRE**) Rule] 403 balancing factor[s], prejudicial versus probative, and [found the alleged-chair-incident evidence to be] more probative than prejudicial."

On appeal, as the Majority explains, the State argues that Feliciano opened the door to the alleged-chair-incident evidence by testifying that CW's marijuana usage had led to the deterioration of their relationship.

Citing State v. Lavoie, 145 Hawaiʻi 409, 422, 453 P.3d 229, 242 (2019), the Majority recognizes that the opening-the-door doctrine is a rule of "expanded relevancy." Under the opening-the-door doctrine analyzed in Lavoie, when one party introduces inadmissible evidence, that evidence may be countered by inadmissible evidence from the opposing party. Id. (citing State v. Fukusaku, 85 Hawaiʻi 462, 497, 946 P.2d 32, 67 (1997)). The supreme court pointed out that this doctrine does not allow

2

inadmissible evidence to be admitted to rebut inferences raised by the introduction of admissible evidence.  Id. at 422-23, 453 P.3d 242-43 (citation omitted).[1]

On appeal in this case, the State does not argue that Feliciano introduced inadmissible evidence, and therefore opened the door to the State's introduction of inadmissible evidence. Instead, the State now argues that Feliciano's strategy was to portray CW as a person of bad character, *i.e.*, someone who smoked a lot of marijuana and might have been unfaithful to her husband. However, at trial, the fact that CW smoked marijuana was raised in the State's direct examination of CW, where it was described as medical marijuana for back pain.  Similarly, the fact that Feliciano found CW sleeping next to his friend was raised in the State's direct examination of CW, where she explained that she fell asleep on the couch first and only discovered the friend next to her when Feliciano woke her up.  On appeal, the State further argues that Feliciano brought up the issue of the prior separation to induce sympathy for him and to attack CW's credibility.  However, before the Family Court, the State posited that "I'm not going to ask her why she moved out at all.  I'm going to ask her about the chair incident."

---

[1]       In Lavoie, the supreme court recognized that *other jurisdictions* have held that admissible evidence that is false or misleading in isolation may open the door to inadmissible evidence that clears up a false impression or clarifies misleading evidence.  145 Hawaiʻi at 424, 453 P.3d at 244. However, the supreme court in Lavoie further stated that it "may have implicitly rejected [this proposition] in Fukusaku," before noting that such a rule would not apply in the case before it even if the court were to adopt it. Id. (citation omitted).

The State cites <u>State v. Kazanas</u>, 138 Hawaiʻi 23, 375 P.3d 1261 (2016), for the proposition that the defendant in that case opened the door to one incident of prior-bad-acts evidence that was necessary to counter his testimony that he could not have attacked the complaining witness because he was physically unable to attack a person, *i.e.*, Kazanas denied that he was the attacker and therefore it was necessary to establish his identity as the perpetrator. Here, however, Feliciano did not deny that he struck CW; Feliciano testified that he struck CW prior to Family Court's ruling on the alleged-chair-incident evidence. Instead, he characterized his actions as self-defense.

Feliciano did state that he did not want CW to move out and that she wanted to separate and she initiated the move-out. This did not open the door to prior-bad-acts testimony, without regard to the probative nature and prejudicial effect of the testimony. The Family Court's explanation to the jury, that the alleged-chair-incident evidence was to be considered "on the issue of the relationship of the parties," is unrelated to any purported opening by Feliciano that was countered or clarified by the alleged-chair-incident evidence. Feliciano's testimony did not open the door to an allegation that Feliciano committed another act of abuse eleven months earlier, which allegedly led to CW's leaving him four months later.

Finally, as noted above, Hawaii's opening-the-door doctrine is a rule of expanded relevancy. Even if Feliciano's

4

testimony made the reasons for CW's departure from the couple's home more relevant pursuant to the opening-the-door doctrine, absent clear precedent to the contrary, I cannot conclude that the opening-the-door doctrine obviates the need to balance the probative value of the evidence against its potential prejudice.[2] The reason for CW's move-out was not a fact of consequence to the determination of whether Feliciano committed the charged offense. Thus, the admissibility of the testimony regarding Feliciano's alleged prior bad act must be evaluated on its own merit pursuant to HRE Rules 403 and 404(b).

II.  HRE Rules 403 and 404(b)

Generally, under HRE Rules 401, 403, and 404(b), evidence of a criminal defendant's prior bad acts is admissible only where it is relevant and necessary to establish an element of the State's case.  See generally State v. Gallagher, 146 Hawaiʻi 462, 463 P.3d 1119 (2020).  Relevance is defined in broad terms as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  HRE Rule 401.  Evidence of a defendant's prior bad acts "may [] be admissible where such evidence is probative of another fact that is of consequence to the determination of

---

[2]  Although the Family Court later stated that the court balanced the prejudicial nature of the alleged-chair-incident against its probative value, the court allowed the State to pursue questioning in front of the jury about whether CW moved out because of something Feliciano did to her, and then whether he pushed her out of a chair because he was upset about something to eat, before ruling on the issue of prejudice.

the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident."  HRE Rule 404(b).  Here, the Family Court did not admit the prior-bad-acts evidence for any of these purposes.

More importantly, prior-bad-acts evidence may not be used to "prove the character of a person in order to show action in conformity therewith."  Id.  Such evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  HRE Rule 403.  Admissibility of prior-bad-acts evidence is therefore limited and circumscribed by the demonstrable need for such evidence.  Gallagher, 146 Hawaiʻi at 472-73, 463 P.3d at 1129-30.  This condition serves to protect a defendant from improper jury bias and engendered hostility by limiting the State's case to the bounds of facts that bear on the defendant's culpability for the alleged crime at bar, rather than based on considerations that are independent of the charged offense.  Id. at 481, 463 P.3d at 1138.

Determining whether to admit prior-bad-acts evidence thus requires balancing the probative value and necessity of the evidence to the State's case with its potential prejudicial effect against the defendant.  As the supreme court has held, and repeatedly affirmed, this balancing test requires a trial judge to consider the following factors:

6

> the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

Id. at 470, 463 P.3d at 1127 (quoting State v. Behrendt, 124 Hawaiʻi 90, 106, 237 P.3d 1156, 1172 (2010) (quoting State v. Renon, 73 Haw. 23, 38, 828 P.2d 1266, 1273 (1992))). Fundamentally, these factors are to be "considered in light of the purpose for which the evidence [is] offered." Id.

Turning to the case at bar, we analyze the Family Court's application of the balancing test factors under the abuse of discretion standard. See State v. Acker, 133 Hawaiʻi 253, 274, 327 P.3d 931, 952 (2014); see also Gallagher, 146 Hawaiʻi at 470, 463 P.3d at 1127. Where an abuse of discretion is found, this court must vacate the defendant's conviction unless the error is harmless beyond a reasonable doubt. See Gallagher, 146 Hawaiʻi at 470, 463 P.3d at 1127 (citation omitted).

In Gallagher, the defendant was charged and convicted of criminal property damage in the second degree. Id. at 464, 463 P.3d at 1121. The alleged property damage occurred after a "series of escalating events" involving four prior incidents of "aggressive and erratic behavior by the defendant directed at the complaining witnesses and their home." Id. at 464, 463 P.3d at 1121. Gallagher sought to exclude evidence of these prior bad acts on the grounds that they were irrelevant and unfairly prejudicial under HRE Rules 404 and 403. Id. at 469-70, 463 P.3d

at 1126-27.  On review, the supreme court held that the trial court abused its discretion in admitting the evidence, concluding that the "risk of unfair prejudice posed by the introduction of the four prior incidents substantially outweighed their limited probative value."  Id. at 464, 463 P.3d at 1121.  The Court further held that the error was not harmless beyond a reasonable doubt and therefore vacated the conviction.  Id. at 481–82, 463 P.3d at 1138–39.

In this case, the disputed evidence adduced at trial is purported to provide context about the relationship between Feliciano and CW, in the lead up to the offense of Abuse of a Family or Household Member, of which Feliciano was convicted.  The alleged-chair-incident evidence, although relevant to why CW moved out, is also relevant to whether the parties had a frayed and physically abusive relationship.  Evidence concerning the couple's relationship could bear on whether it was more or less probable that Feliciano either struck CW in the face with his fist on January 14, 2017, as CW testifed, or that Feliciano slapped CW in self-defense on the morning in question.  Nevertheless, marginally probative evidence of prior abuse has a great potential for unfair prejudice.  See Lavoie, 145 Hawaiʻi at 426, 453 P.3d at 246 (in light of the stigma attached to domestic abusers, evidence of prior abuse is highly likely to rouse a jury to overmastering hostility against a defendant charged with domestic abuse) (citations omitted).

The first factor to be considered in determining whether the Family Court abused its discretion in admitting the alleged-chair-incident evidence is the strength of the testimony. Unlike in Gallagher, where the offered testimony was a series of escalating and undisputed events attested to by multiple witnesses, Gallagher, 146 Hawaiʻi at 464, 463 P.3d at 1121, Feliciano testified that the chair incident did not happen. CW's testimony was quite narrow, attesting only that she moved out of their home because Feliciano pushed her out of a chair in February of 2016. This testimony is arguably weakened by the delay between the alleged chair incident and her move out months later. Although the testimony in question arguably falls within the scope of its purpose of providing context regarding the nature of the parties' relationship, it is in dispute and uncorroborated, and it addresses an issue that is only peripherally related to the alleged offense. See Lavoie, 145 Hawaiʻi at 426, 453 P.3d at 246 ("evidence of Lavoie's prior abuse had little, if any, probative value as to his state of mind at the time of the shooting or to its reasonableness"). The strength of this evidence weighs against admittance.

Likewise, the alleged-chair-incident evidence relates to an isolated incident that is separated by nearly a year from the charged offense under consideration. In contrast, in Gallagher, the four prior bad acts took place over a six-month period culminating eleven days prior to the property damage at

issue.  See 146 Hawaiʻi at 471, 463 P.3d at 1128.  Here, there are no intervening events linking the two alleged acts.  In fact, the only thing that appears to link these events is that they both involve allegations that Feliciano abused his wife.  The distance in time, and limited relevance (except for propensity, of course), of the alleged-chair-incident evidence to the offense thus limits the permissible probative value that can be derived from admitting the testimony.

On the other hand, the similarities between Feliciano's alleged actions cannot be overlooked.  Pushing an adult out of a chair is a physical and aggressive act, much like striking someone in the face.  While the effect or specific intent of a slap or punch may differ in degree, the abusive quality is rather similar.

Although similarity can be used to confirm identity or establish voluntariness vis-à-vis common methodology, a close connection in the nature of prior and current misconduct "may also increase the likelihood that a jury will consider the previous conduct to conclude that the defendant has a propensity for committing such acts, which is a prohibited inference."  Id. at 472, 463 P.3d at 1129 (citing HRE Rule 404(b)); accord State v. Murray, 116 Hawaiʻi 3, 20, 169 P.3d 955, 972 (2007).  Where identity, or another core issue, is not in dispute, such evidence could confuse or mislead the jury.  See Gallagher, 146 Hawaiʻi at 476, 463 P.3d at 1133.  Even though the similar nature of the

10

acts here suggests some probative value, prudential concerns animating the prohibition on propensity evidence lead to the conclusion that the alleged-chair-incident evidence is highly prejudicial to Feliciano and militate against admission.

The fourth factor of the balancing test is the need for the proffered evidence. Considering the permissible consideration of the evidence, as explained to the jury – to elicit context about the couple's relationship – it appears from the record that ample evidence had already been introduced regarding the frayed nature of the marriage and establishing that Feliciano and CW had a difficult relationship. There was evidence that Feliciano was critical of CW's marijuana consumption; there was also evidence that CW was critical of Feliciano's alcohol consumption. It does not appear to me that there is a "demonstrable need to introduce evidence of prior bad acts" to consider the issue of the relationship of the parties in this case. See id. at 473, 463 P.3d at 1130. This factor weighs against admittance.

I recognize that there was no alternative evidence of Feliciano's alleged prior misconduct available to the jury to negate the "necessity" of alleged-chair-incident evidence and the Family Court allowed no prejudicial details of the alleged earlier incident. Unlike in Gallagher, where there was lengthy testimony, multiple witnesses, and photographical evidence of the extent of the property damage, the permitted testimony was

11

limited to Feliciano's denial that the incident took place and CW's testimony that the incident was the reason that she moved out.  See id. at 474, 463 P.3d at 1131.  This dearth of alternative evidence weighs in favor of admitting the chair-incident testimony.

The ultimate factor of the balancing test is whether the evidence is highly prejudicial, often stated as whether the evidence has "the potential to rouse the jury to overmastering hostility" against a defendant.  Id. at 470, 463 P.3d at 1127 (citation omitted).  Evidence of prior bad acts can engender an emotional response in the jury and tend to suggest decision on an improper, often emotional, basis.  This is the axiom of prejudice prohibited by HRE Rules 403 and 404(b).  See id. at 476-77, 463 P.3d at 1133-34.  Here, although there was limited presentation of a single prior bad act, CW's testimony retained the potential to inspire ill-will and hostility toward Feliciano as an abusive husband based on the prior alleged incident.  The bare fact that CW allegedly moved out of their home because of an alleged prior incident of abuse carries a high risk of a prejudicial inference that he did abuse her before and therefore he probably abused her again.  This is the prototype of propensity evidence that should be allowed only when the probative value concerning an element of the offense or the defendant's defense is high.

In light of these considerations, the potential for unfair prejudice substantially outweighed the evidence's

12

probative value and the Family Court abused its discretion when it overruled Feliciano's objections and allowed the alleged-chair-incident evidence.

The Family Court's limiting instruction attempted to minimize the prejudicial effect of the alleged-chair-incident evidence by limiting the jury's consideration to the rather vague issue of "the relationship of the parties."  While the Majority disposition correctly cites Hawaiʻi cases holding that the jury is presumed to follow the trial court's instruction, I conclude that this vague instruction is prejudicially insufficient to prevent the jury from, for example, concluding from the alleged-chair-incident evidence that the relationship was an abusive one and therefore Feliciano is more likely to have committed the charged offense.  This insufficiency was later compounded by the Family Court's inconsistent and confusing instruction that the evidence of the alleged-chair-incident evidence could be only considered on the issue of the defendant's motive.  When read and considered as a whole, the Family Court's jury instructions pertaining to the alleged-chair-incident evidence were "prejudicially insufficient, erroneous, inconsistent, or misleading."  See generally State v. Nichols, 111 Hawaiʻi 327, 334, 141 P.3d 974, 981 (2006).  On the record in this case, the Family Court's jury instructions failed to mitigate the prejudicial effect of the alleged-chair-incident evidence.

13

Finally, it is necessary to consider whether the Family Court's error was harmless beyond a reasonable doubt. The harmless beyond a reasonable doubt standard requires us to "examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." Gallagher, 146 Hawaiʻi at 481, 463 P.3d at 1138 (citation omitted). Although the impermissible evidence at issue here was limited, the fact remains that prejudice can spring from even the smallest inference. On the other hand, the undisputed evidence at trial included that Feliciano struck his wife and the only disputed issue was whether it was abuse or self-defense. It cannot be ruled out that, based on the alleged-chair-incident evidence, the jury would have viewed Feliciano's conduct as part of a pattern of abuse and convicted Feliciano out of a desire to relieve CW of the burden of this hardship. Thus, there is a real possibility that the error contributed to Feliciano's conviction, and I cannot conclude that the error was harmless beyond a reasonable doubt.

Accordingly, I would vacate the Family Court's June 2, 2017 Judgment and remand this case to the Family Court for a new trial.

/s/ Katherine G. Leonard
Presiding Judge